## SOUTHERN RAILWAY CO. *v.* NORTH CAROLINA ET AL.

No. 74. Argued January 14–15, 1964.—Decided February 17, 1964.*

*William T. Joyner* argued the cause for appellant in No. 74. With him on the brief were *Earl E. Eisenhart, Jr., Robert L. Randall* and *William H. Allen.*

*Together with No. 93, *United States et al.* v. *North Carolina et al.*, also on appeal to the same court.

*Robert W. Ginnane* argued the cause for the United States et al. in No. 93. With him on the brief were *Solicitor General Cox, Assistant Attorney General Orrick, Philip B. Heymann, Robert B. Hummel* and *H. Neil Garson.*

*Charles W. Barbee, Jr.,* Assistant Attorney General of North Carolina, and *F. Gordon Battle* argued the cause for appellees in both cases. With them on the brief were *Thomas Wade Bruton,* Attorney General of North Carolina, *E. C. Bryson, Victor S. Bryant, A. H. Graham, Jr.* and *E. C. Brooks, Jr.*

*Edward J. Hickey, Jr.* and *James L. Highsaw, Jr.* filed a brief for the Railway Labor Executives' Association, as *amicus curiae,* urging affirmance.

MR. JUSTICE STEWART delivered the opinion of the Court.

In 1959 the appellant Southern Railway Company filed a petition with the North Carolina Utilities Commission for an order permitting it to discontinue operation of two intrastate passenger trains between Greensboro and Goldsboro, North Carolina, a distance of about 130 miles. The trains in question are No. 16, which operates eastbound in the morning from Greensboro to Goldsboro, and No. 13, consisting of the same equipment, which operates westbound in the late afternoon. Since 1958 these two trains have provided the last remaining railway passenger service between the two communities. The State Commission denied the petition, and its decision was upheld by the North Carolina Supreme Court. *State of North Carolina* v. *Southern Railway Co.,* 254 N. C. 73, 118 S. E. 2d 21 (1961).

Thereafter the railway company filed a petition with the Interstate Commerce Commission pursuant to § 13a (2)

of the Interstate Commerce Act,[1] seeking authority to discontinue operation of the trains. After a hearing at which several protestants, including the State of North Carolina, appeared, the examiner recommended that the petition be granted. Division 3 of the Commission agreed with the examiner and ordered discontinuance of the trains. The Division issued a report in which it found, *inter alia,* that the trains, which in 1948 had carried 56,739 passengers, carried only 14,776 passengers in

[1] Section 13a (2) of the Interstate Commerce Act, 49 U. S. C. § 13a (2), provides in pertinent part:

"Where the discontinuance or change, in whole or in part, by a carrier or carriers subject to this chapter, of the operation or service of any train or ferry operated wholly within the boundaries of a single State is prohibited by the constitution or statutes of any State or where the State authority having jurisdiction thereof shall have denied an application or petition duly filed with it by said carrier or carriers for authority to discontinue or change, in whole or in part, the operation or service of any such train or ferry or shall not have acted finally on such an application or petition within one hundred and twenty days from the presentation thereof, such carrier or carriers may petition the Commission for authority to effect such discontinuance or change. The Commission may grant such authority only after full hearing and upon findings by it that (a) the present or future public convenience and necessity permit of such discontinuance or change, in whole or in part, of the operation or service of such train or ferry, and (b) the continued operation or service of such train or ferry without discontinuance or change, in whole or in part, will constitute an unjust and undue burden upon the interstate operations of such carrier or carriers or upon interstate commerce. When any petition shall be filed with the Commission under the provisions of this paragraph the Commission shall notify the Governor of the State in which such train or ferry is operated at least thirty days in advance of the hearing provided for in this paragraph, and such hearing shall be held by the Commission in the State in which such train or ferry is operated; and the Commission is authorized to avail itself of the cooperation, services, records and facilities of the authorities in such State in the performance of its functions under this paragraph."

1960, the last full year for which figures were available; that the direct expenses of operating the trains during the latter year were over three times their total revenue; that discontinuance of the trains would result in savings of at least $90,589 per year; that the need shown for these trains was relatively insubstantial when viewed in light of the density of the population of the area served; that existing alternate transportation service by rail, bus, airline, and other means was reasonably adequate; and that the discontinuance of the passenger train service would not seriously affect the industrial growth of the area. Against the backgound of these findings, the examiner and Commission considered, but gave "little or no weight" to the overall prosperity of the carrier. The Commission's basic conclusions were summed up as follows:

> "that the public will not be materially inconvenienced by the discontinuance of the service here involved; that the savings to be realized by the carrier outweigh the inconvenience to which the public may be subjected by such discontinuance; that such savings will enable the carrier more efficiently to provide transportation service to the public which remains in substantial demand; and that the continued operation of trains Nos. 13 and 16 would constitute a wasteful service and would impose an undue burden on interstate commerce." 317 I. C. C. 255, 260.

After a petition for reconsideration by the entire Commission had been denied, the protestants instituted an action in a three-judge District Court seeking to set aside the order of the Commission. The court held, first, that it was erroneous as a matter of law for the Commission to order discontinuance of passenger trains under the provisions of § 13a (2) without first determining whether, once the profits from freight operations on

the same line were taken into account, "the particular segment of the railway involved is contributing its fair share to the over-all company operations . . . ." 210 F. Supp. 675, 688. The court also proceeded to find, *inter alia,* that "Taking into account total operation of this line, there is a profit not a loss, a benefit, not a burden," 210 F. Supp., at 688; that passenger traffic had slightly increased during the first five months of 1961; that the carrier had done little to promote the use of the passenger trains; that continued existence of the alternative of railway passenger service might be considered a necessity under such circumstances as airline strikes or bad weather; and that, in light of the overall prosperity of the Southern Railway Company, "[t]he effect of the losses of the Greensboro-Goldsboro passenger service on the financial structure of the railroad is inconsequential." [2] 210 F. Supp., at 688. On this basis, although it explicitly refused to set aside any of the subsidiary findings of fact on which the Commission's order was based, 210 F. Supp., at 689, 690, the court held that "the ultimate conclusions of the Interstate Commerce Commission that the service in question constitutes an undue burden on interstate commerce and that the present or future public convenience and necessity permits such discontinuance . . . are arbitrary and capricious because . . . not supported by

---

[2] It should be noted, in connection with the findings made by the District Court, that the Commission had noted that the increase in passenger traffic during 1961 was largely due to group movements of school children; that, as to Southern's failure to seek passengers, "prospective patrons who must be coaxed to use a service have no urgent need for it"; and that, after a broad study and investigation in 1959, the Commission had concluded that "public convenience and necessity" does not require the maintenance of deficit passenger services as a standby service for travelers who customarily travel by highway or by air. *Railroad Passenger Train Deficit,* 306 I. C. C. 417, 482.

substantial evidence," 210 F. Supp., at 689. The court itself then concluded that discontinuance was not warranted. It therefore set aside the Commission's order, and perpetually enjoined the carrier from discontinuing the Greensboro-Goldsboro passenger trains. The United States, the Interstate Commerce Commission, and the carrier all appealed. We noted probable jurisdiction and consolidated the cases for argument. 373 U. S. 907.

The District Court's action in setting aside the Commission's conclusions as to public convenience and necessity and undue burden on interstate commerce was explicitly based upon the court's view that the Commission had applied erroneous legal standards in reaching those conclusions. The court did not question that the Commission's subsidiary findings of fact were supported by a substantial evidentiary foundation. It simply disagreed with the Commission as to the kind of evidence required to support an order permitting discontinuance of an intrastate passenger train under § 13a (2).

The court reached its conclusion that the Commission had erred in not taking into account profits from freight operations along the Greensboro-Goldsboro line primarily in reliance upon this Court's decisions in *Public Service Comm'n of Utah* v. *United States,* 356 U. S. 421, and *Chicago, M., St. P. & P. R. Co.* v. *Illinois,* 355 U. S. 300. Both those cases dealt with § 13 (4), which requires the Commission to change intrastate rates wherever such rates are found to discriminate against interstate commerce. This Court held in those cases that the Commission could not authorize higher intrastate rates either for passenger or freight operations without first taking into account the revenues derived by the carrier from the totality of intrastate operations. In 1958, the year in which § 13a (2) was enacted, § 13 (4) was amended to

permit the Commission to act "without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier . . . wholly within any State." [3] The District Court's holding that the same kind of data should be considered in § 13a (2) proceedings was premised upon the fact that no language similar to that of the § 13 (4) amendment was included in § 13a (2), and that proceedings under the latter provision, which permits discontinuance of given operations, have a far more serious impact upon intrastate passengers than proceedings under the former, which provides only for an increase in the rates to be charged.

But when § 13 (4) was amended in 1958 as a result of the two decisions relied on by the District Court, Congress was simply reaffirming what it conceived as the original intent of the section.[4] There is therefore no reason to

---

[3] 49 U. S. C. § 13 (4), as so amended, provides in pertinent part:

"Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce (which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any State), which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, discrimination, or burden . . . ."

[4] "[I]t is the possible interpretation of these recent court decisions that would create a change in the present regulatory scheme." H. R. Rep. No. 2274, 85th Cong., 2d Sess., 12.

assume that Congress regarded the new language as embodying a standard which had to be specifically incorporated into every statutory provision to which it was intended to apply.

The legislative history clearly indicates that Congress in enacting § 13a (2) was addressing itself to a problem quite distinct from that reflected by overall unprofitable operation of an entire segment of railroad line. The Commission already had authority prior to 1958, under §§ 1 (18)–(20),[5] to authorize discontinuance of all services on any given intrastate line where continuance of

---

[5] 49 U. S. C. § 1 (18) provides in pertinent part:

"No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

49 U. S. C. § 1 (19) provides in pertinent part:

"The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this chapter shall apply to all such proceedings."

49 U. S. C. § 1 (20) provides in pertinent part:

"The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require."

such services would impose an undue burden on interstate commerce. *Colorado* v. *United States,* 271 U. S. 153. However, the Commission totally lacked power to discontinue particular trains or services while leaving the remaining services in operation. It was precisely this gap which § 13a (2) was intended to fill. *New Jersey* v. *New York, S. & W. R. Co.,* 372 U. S. 1, 5–6. As both the House and Senate Committee Reports on the legislation which became § 13a (2) make clear, Congress was primarily concerned with the problems posed by passenger services for which significant public demand no longer existed and which were consistently deficit-producing, thus forcing the carriers to subsidize their operation out of freight profits.[6] Far from permitting the carrier's need for discontinuance of passenger services to be balanced against profits from other operations conducted

---

[6] "A major cause of the worsening railroad situation is the unsatisfactory passenger situation. Not only is the passenger end of the business not making money—it is losing a substantial portion of that produced by freight operations.

.        .        .        .        .

"It is obvious that in very great measure these passenger losses are attributable to commuter service. . . . It is unreasonable to expect that such service should continue to be subsidized by the freight shippers throughout the country.

"There are substantial losses, however, occurring in passenger service beyond those attributable solely to commuter service. Where this passenger service . . . cannot be made to pay its own way because of lack of patronage at reasonable rates, abandonment seems called for." H. R. Rep. No. 1922, 85th Cong., 2d Sess., 11–12.

"A most serious problem for the railroads is the difficulty and delay they often encounter when they seek to discontinue or change the operation of services or facilities that no longer pay their way and for which there is no longer sufficient public need to justify the heavy financial losses entailed. The subcommittee believes that the maintenance and operation of such outmoded services and facilities constitutes a heavy burden on interstate commerce." S. Rep. No. 1647, 85th Cong., 2d Sess., 21.

along the same line, the bill as originally reported by the Senate Committee would have required the Commission to permit discontinuance, even if there was great public need for the service, so long as the continued operation of a particular service would result in a net loss to the carrier.[7] Senator Javits unsuccessfully attempted to amend the bill on the floor of the Senate to delete the net loss standard and to substitute a requirement that the Commission balance the public need for the service against the deficit resulting from it.[8] Such an amendment, proposed by Chairman Harris of the House Interstate and Foreign Commerce Committee, was adopted by the House,[9] and accepted by the Senate in conference. The deletion of the net loss standard, however, by no means implied that freight profits along a given line could be offset against deficits incurred by passenger services for purposes of determining whether the latter constituted an undue burden on interstate operations or commerce. As Congressman Harris made clear after his amendment had been accepted, the situation "we are trying to get at" is that in which "the [freight] shippers of this country are making up a deficit every year . . . in losses in passenger service."[10]

The bill as originally reported by the Senate Committee would have applied the net loss standard to both interstate and intrastate operations, the Committee Report having concluded that state regulatory bodies required

---

[7] S. 3778, 85th Cong., 2d Sess., 6. See also the remarks of Senator Smathers, Chairman of the Surface Transportation Subcommittee, who made it clear that the net loss standard did not refer to all operations on a line or all operations within a State but rather to "the loss from the particular operation the railroad is rendering." 104 Cong. Rec. 10849.

[8] See 104 Cong. Rec. 10846–10849. See also pp. 10838–10839.

[9] 104 Cong. Rec. 12547–12548.

[10] 104 Cong. Rec. 12551.

"the maintenance of uneconomic and unnecessary services and facilities." [11] The bill was amended on the Senate floor to limit the Commission's discontinuance authority to interstate trains,[12] and the House version of the bill was similarly limited.[13] In conference, however, the Commission's authority over intrastate trains was restored and, except for differences in the procedures prerequisite to a hearing in the case of a wholly intrastate train,[14] the Commission was required to apply the same standard to interstate and intrastate operations in determining whether discontinuance of a train or service is justified.[15] Contrary to the suggestion of the District Court that its interpretation of § 13a (2) must be accepted to avoid "requir[ing] the intrastate operations to bear more than their share," 210 F. Supp., at 680, the statutory scheme which Congress has embodied in § 13a thus prescribes precisely the same substantive standard to govern discontinuance of either interstate or intrastate operations.[16]

---

[11] S. Rep. No. 1647, 85th Cong., 2d Sess., 22.

[12] 104 Cong. Rec. 10862, 10864.

[13] H. R. 12832, 85th Cong., 2d Sess., 10.

[14] Under § 13a (2), which applies solely to intrastate trains, the Commission may not authorize discontinuance until after the appropriate state regulatory agency has been given an opportunity to act and has failed or refused to authorize discontinuance. See *New Jersey* v. *New York, S. & W. R. Co.*, 372 U. S. 1, 4.

[15] See 49 U. S. C. § 13a (1), (2).

[16] The fact that Congress intended the same substantive standards to be applied both to intrastate and interstate discontinuances wholly vitiates appellees' argument that the Commission is required to take into account, wherever presented, the profitability of intrastate operations as a whole or any segment thereof whenever an intrastate service is sought to be discontinued. Thus, consideration of the overall prosperity of the carrier is necessarily relevant to a determination of the degree to which a deficit resulting from a given service constitutes an undue burden on interstate commerce. But neither the

All that need properly be considered under this standard, as both the language and history of § 13a (2) thus make abundantly clear, is what effect the discontinuance of the specific train or service in question will have upon the public convenience and necessity and upon interstate operations or commerce. As the Commission has correctly summed up the matter in another case:

"The burden [upon the carrier's interstate operations or upon interstate commerce, as expressed in section 13a (2)] . . . is to be measured by the injurious effect that the continued operation of the train proposed for discontinuance would have upon interstate commerce. As is indicated by its legislative history, the purpose of section 13a (2) is to permit the discontinuance of the operation of services that 'no longer pay their way and for which there is no longer sufficient public need to justify the heavy financial losses involved.' (S. Rep. 1647, 85th Cong.). Nowhere in section 13a (2) or elsewhere in the law is there any requirement that the prosperity of the intrastate operations of the carrier as a whole, or any particular segment thereof, must be given effect in determining whether the operation of an individual intrastate train imposes an unjust and undue burden on interstate commerce. To hold otherwise would be contrary to the apparent intent of the Congress." *Southern Pac. Co., Partial Discontinuance*, 312 I. C. C. 631, 633–634 (1961).

This Court has long recognized that the Commission may properly give varying weights to the overall pros-

profitability of such freight operations as are fortuitously conducted on the same line as a given passenger service nor the profitability of all operations within any given State bears any practical relationship either to the public's need for the service in question or to the burden which the deficit imposes on interstate commerce.

perity of the carrier in differing situations. Thus, in *Colorado* v. *United States,* 271 U. S. 153, which also involved a situation in which the Commission was required to balance public convenience and necessity against undue burdens on interstate commerce, it was specifically noted that "In many cases, it is clear that the extent of the whole traffic, the degree of dependence of the communities directly affected upon the particular means of transportation, and other attendant conditions, are such that the carrier may not justly be required to continue to bear the financial loss necessarily entailed by operation. In some cases . . . the question is whether abandonment may justly be permitted, in view of the fact that it would subject the communities directly affected to serious injury while continued operation would impose a relatively light burden upon a prosperous carrier." 271 U. S., at 168–169. In cases falling within the latter category, such as those involving vital commuter services in large metropolitan areas where the demands of public convenience and necessity are large, it is of course obvious that the Commission would err if it did not give great weight to the ability of the carrier to absorb even large deficits resulting from such services. But where, as here, the Commission's findings make clear that the demands of public convenience and necessity are slight and that the situation is, therefore, one falling within the first category delineated in *Colorado,* it is equally proper for the Commission, in determining the existence of the burden on interstate commerce, to give little weight to the factor of the carrier's overall prosperity.

Whatever room there may be for differing views as to the wisdom of the policy reflected in § 13a (2), it is the duty of the Commission to effectuate the statutory scheme. We cannot agree with the District Court that the Commission departed in any respect from that duty

here. We therefore reverse the judgment of the District Court and remand with instructions to reinstate the report and order of the Commission.

*Reversed.*

MR. JUSTICE GOLDBERG, with whom THE CHIEF JUSTICE joins, dissenting.

This case involves more than the fate of the 6:10 between Greensboro and Goldsboro, North Carolina. It is the first litigation to reach this Court concerning the criteria to be applied by the Interstate Commerce Commission in proceedings seeking discontinuance of intrastate passenger trains under § 13a (2) of the Interstate Commerce Act, 72 Stat. 571, 49 U. S. C. § 13a (2). This section provides that where a State has failed or refused to allow discontinuance of an intrastate passenger train, the ICC may authorize the intrastate discontinuance if it finds "that (a) the present or future public convenience and necessity permit of such discontinuance . . . and (b) the continued operation . . . will constitute an unjust and undue burden upon the interstate operations of such carrier . . . or upon interstate commerce." The Court sustains the ICC in interpreting this provision to mean that, in determining whether an unprofitable intrastate passenger train shall be discontinued, the Commission need give: (1) "little or no weight" to the overall prosperity of the carrier, *ante,* at 96, and (2) no consideration whatsoever to the profitability of "the intrastate operations of the carrier as a whole, or any particular segment thereof," *ante,* at 104.[1] In my view the standards employed by the Commission were not the proper ones. Consequently, without intimating any opinion as to the merits of the discontinuance application, I would remand the

---

[1] See the statement of the hearing examiner set forth in note 4, *infra.*

case to the Commission for further consideration and appropriate findings. See, *e. g., Interstate Commerce Comm'n* v. *J–T Transport Co., Inc.,* 368 U. S. 81, 93.

Since "[p]assenger deficits have become chronic in the railroad industry," *Chicago, M., St. P. & P. R. Co.* v. *Illinois,* 355 U. S. 300, 307, the Court's decision will allow the Commission to authorize the Nation's railroads to discontinue virtually all intrastate passenger service—including most commuter services. It is difficult to conceive of a situation in this era of widespread bus, airline and automobile transportation in which the Commission cannot find that alternative services are more or less available to handle the diminished railroad passenger traffic. Such a finding coupled with a "net loss" on the passenger trains will meet the discontinuance standard approved by the Court. The Court concludes that this result has been mandated by Congress. If this were so, there would be no basis for dissent, since I agree entirely with the Court that "[w]hatever room there may be for differing views as to the wisdom of the policy . . . , it is the duty of the Commission [and the Court] to effectuate the statutory scheme." *Ante,* at 105. I do not believe, however, that it can be fairly concluded from the statute or from its legislative history that Congress intended, despite the ruling of a state authority, that intrastate passenger trains could be discontinued on the basis of the slender showing required by the ICC and approved by this Court.

The case turns upon the language and purpose of § 13a (2) of the Interstate Commerce Act. This section was first enacted as part of the Transportation Act of 1958. It is true, as the Court points out, that this legislation reflects concern with "the worsening railroad situation." *Ante,* at 101, n. 6. But it is far from accurate to conclude that Congress was oblivious of the needs of the passenger public and of the primary responsibility of

state commissions for the regulation of purely intrastate service. Under §13a (2) a railroad seeking to discontinue an intrastate passenger train, as distinguished from an interstate operation, must first apply to the appropriate state commission. Only after the state commission has been given the opportunity and has failed or refused to act is the ICC authorized to intervene. The Commission may reverse the decision of the state agency only upon findings, supported by substantial evidence, that the service is not required by public convenience and necessity *and* that its continuance will constitute "an unjust and undue burden . . . upon interstate commerce." Senator Smathers, one of the bill's sponsors, explained that § 13a (2):

> "protected the right of the States, . . . by leaving to the State regulatory agencies the right to regulate and have a final decision with respect to the discontinuance of train service which originated and ended within one particular State, except when it could be established that intrastate service was a burden on interstate commerce." 104 Cong. Rec. 15528.

In this case the State of North Carolina points out that between 1951 and 1956, of 44 requests for discontinuance of intrastate passenger trains, some emanating from appellant Southern Railway, 42 were approved by the State. Indeed, on the line between Greensboro and Goldsboro, Southern operated three pairs of passenger trains until September 1954. The State, on Southern's application, authorized discontinuance of one pair of trains in 1954 and another pair in 1958. The two trains in question, No. 13 and No. 16, are the last remaining pair of east-west passenger trains between the two communities. They are the only interconnecting service at Greensboro for passengers from Goldsboro and intermediate points with north-south trains on Southern's main line. For such passengers, they furnish a convenient overnight pullman

service to Washington, New York and other east coast cities and conserve working time for the traveler having business at the north or south terminal cities. Trains 13 and 16 run on tracks leased by Southern from the state-owned North Carolina Railroad Company. The lease clearly contemplates both passenger and freight service. Furthermore, as the Court recites in its opinion, while during the relevant year Southern sustained a loss on its passenger service on the line of approximately $90,000, it made a profit of over $600,000 on freight on the same leased line and an overall profit on its entire system in excess of $36,000,000. While passenger traffic on this line has declined in recent years, the traffic is still substantial—14,776 passengers used the two trains in 1960, an increase of more than 500 over the previous year—and the area served has been growing in population and industrial importance. On these facts, the state agency denied Southern's request to discontinue the two trains. In overruling the decision of the State, the ICC, as already stated, gave "little or no weight" to Southern's overall prosperity and no consideration whatsoever to its freight profits on the line. In my view, the Commission wrongfully ignored these factors and the Court errs in approving this action of the Commission.

I read the Act and its history to require the Commission to take into account all material factors established by evidence presented by the parties and bearing on the issues of public need and burden on interstate commerce. The three-judge District Court properly observed that these issues are "not susceptible of scientific measurement or exact formulae but are questions of degree and involve the balancing of conflicting interests." 210 F. Supp. 675, 684. I cannot comprehend how the Commission can achieve a proper balance without fully considering the railroad's relevant profit data. The issues—whether the public need will allow discontinuance of the

passenger service and whether continued operation will unduly burden interstate commerce—are interrelated. Under any common-sense view of the statute, the amount of the railroad's financial loss on the two intrastate passenger trains cannot be considered in isolation from its freight profits on that line, its intrastate profits, or its overall prosperity. The words "unjust" and "undue" clearly indicate that Congress intended that the mere fact that a particular passenger train is operating at a loss— *i. e.,* is a burden—would not in itself justify discontinuance of that train. The burden must be "unjust" and "undue," and whether this is so cannot be determined except in light of the total circumstances. The final determination must be made by balancing all the relevant factors —"the effort being to decide what fairness to all concerned demands." *Colorado* v. *United States,* 271 U. S. 153, 169. As the decisions of this Court plainly indicate, this does not mean that discontinuance is prohibited unless intrastate passenger and freight service considered together show a net loss or overall profits are substantially impaired. *Colorado* v. *United States, supra; Transit Comm'n* v. *United States,* 284 U. S. 360. Rather, freight profits and overall profits are merely factors to be considered by the Commission in determining whether the particular passenger loss constitutes an unjust and undue burden on interstate commerce when balanced against the public need.[2] Such profits may not be the controlling factors but, when presented, they are to be considered.

---

[2] See *Colorado* v. *United States,* 271 U. S. 153, 168–169 (Brandeis, J.): "In many cases, it is clear that the extent of the whole traffic, the degree of dependence of the communities directly affected upon the particular means of transportation, and other attendant conditions, are such that the carrier may not justly be required to continue to bear the financial loss necessarily entailed by operation. In some cases, although the volume of the whole traffic is small, the question is whether abandonment may justly be permitted, in view of the fact that it would subject the communities directly affected to

The Court dealt with an aspect of the intrastate passenger problem in *Chicago, M., St. P. & P. R. Co.* v. *Illinois,* 355 U. S. 300, and *Public Service Comm'n of Utah* v. *United States,* 356 U. S. 421. These cases involved the construction of § 13 (4) of the Interstate Commerce Act which authorizes the Commission to change intrastate rates whenever such rates discriminatorily burden interstate commerce. In the *Chicago* case the Court said:

> "[W]e do not think that the deficit from this single commuter operation can fairly be adjudged to work an undue discrimination against the Milwaukee Road's interstate operations without findings which take the deficit into account in the light of the carrier's other intrastate revenues from Illinois traffic, freight and passenger. The basic objective of § 13 (4), applied in the light of § 15a (2) to this case, is to prevent a discrimination against the carrier's interstate traffic which would result from saddling that traffic with an undue burden of providing intrastate services. A fair picture of the intrastate operation, and whether the intrastate traffic unduly discriminates against interstate traffic, is not shown, in this case, by limiting consideration to the particular commuter service in disregard of the revenue contributed by the other intrastate services." 355 U. S., at 307–308.

---

serious injury while continued operation would impose a relatively light burden upon a prosperous carrier. The problem and the process are substantially the same in these cases as where the conflict is between the needs of intrastate and of interstate commerce. Whatever the precise nature of these conflicting needs, the determination is made upon a balancing of the respective interests—the effort being to decide what fairness to all concerned demands. In that balancing, the fact of demonstrated prejudice to interstate commerce and the absence of earnings adequate to afford reasonable compensation are, of course, relevant and may often be controlling. But the Act does not make issuance of the certificate dependent upon a specific finding to that effect."

The major premise of the opinion of the Court today, however, is that Congress expressly overruled the *Chicago* and *Public Service Commission* cases by amending § 13 (4) in the Transportation Act of 1958. It is, of course, true that § 13 (4) was amended after these decisions to allow the ICC to determine that intrastate railway rates discriminated against interstate commerce "without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier . . . wholly within any State." 72 Stat. 570, 49 U. S. C. § 13 (4). I cannot agree, however, with the Court's view that Congress by so amending § 13 (4), which deals solely with rate cases, intended that there be read into § 13a (2), which deals solely with discontinuances, language which was not similarly incorporated. Section 13a (2) was initially enacted at the same time that § 13 (4) was amended. If Congress had intended that the ICC need not consider all relevant factors in discontinuance cases, the proposed § 13a (2) could easily have been altered to include the language that was added to § 13 (4) by amendment.

In any event, even if the differing language is to be understood as importing the same standards, it seems to me that the Court reads the amendment to § 13 (4) too broadly. The legislative history shows that Congress intended the amendment to allow the ICC to make a decision under § 13 (4) without considering the totality of the carrier's operations when the parties have not presented these facts to the Commission. When these data are presented, however, and put in issue the amended section would not permit the Commission to ignore the evidence. The amendment provides that the Commission may make its determination without a separation of revenues. The permissive "may," read in light of the legislative history, reflects the intent of Congress "that

a decision of the Commission will not be upset simply because it fails to find specifically these facts where they have not been put in issue by the evidence before the Commission, but this does not mean that such facts where relevant and pertinent are not to be considered." 210 F. Supp. 675, 682. This interpretation of the amendment is supported by this Court's affirmance of the decision of the three-judge District Court in *Utah Citizens Rate Assn.* v. *United States,* 192 F. Supp. 12, aff'd *per curiam,* 365 U. S. 649. The District Court there said:

"We believe that a matter of procedure rather than any substantive change in the basic transportation policy of the Congress is involved. If this were not so, serious conceptual and constitutional, and further practical difficulties, would be invited. But there seems no reason why Congress cannot provide or clarify a procedural factor to render more practical the formula it has theretofore established, and which was, under existing law appropriately considered by the majority in [*Public Service Comm'n of Utah* v. *United States,* 356 U. S. 421]. In our opinion the amendment in this area does no more than to obviate the previously determined necessity of affirmative findings or evidence showing that the intrastate passenger deficit is not lower than the interstate or concerning the profitableness of, or circumstances surrounding, segments of intrastate operations with which the Commission was not immediately concerned. The legislative history of the amendment bolsters this view. There is nothing therein inconsistent with the further recognition that to rebut the prima facie presumption resulting from the amendment those who claim intrastate traffic as a whole is not discriminating against interstate commerce may show as an affirmative matter favorable aspects of intrastate operations. The dissent-

ing opinion to this effect referred to the then pending bill couched in the same language as that later adopted in the Transportation Act of 1958, and the Committee, considering the pending legislation, cited the dissenting opinion with apparent approval." [3] 192 F. Supp., at 18–20.

The dissenting opinion referred to by the court had said:

"Of course, those who contend that intrastate traffic as a whole is not discriminating against interstate traffic may come forward and show, as they may in respect to any claimed dissimilarity of conditions surrounding interstate and intrastate traffic, some favorable aspect of intrastate operations that the Commission should take into account. In the absence of such a showing, however, the Commission should be able to assume that discrimination shown to exist as to the particular segments of intrastate and interstate traffic with which the § 13 (4) proceeding is concerned is not offset by other conditions that this Court speculates may affect wholly different segments of intrastate commerce." *Public Service Comm'n of Utah* v. *United States, supra,* at 462–463.

It necessarily follows that if § 13 (4), with its amendatory language, does not permit the Commission to ignore evidence of all relevant facts actually offered by the parties in a rate case, such evidence cannot be disregarded in a discontinuance proceeding under § 13a (2) which lacks even the amending language.

Finally, the legislative history of § 13a (2) plainly demonstrates that the Court has mistaken the intent of Congress. The bill initially considered by the Senate

---

[3] See the Conference Report, H. R. Rep. No. 2274, 85th Cong., 2d Sess.

provided that discontinuance would be denied and the continuance approved if the Commission found that:

"the operation or service of such train . . . is required by public convenience and necessity *and that such operation or service will not result in a net loss therefrom to the carrier or carriers* and will not otherwise unduly burden interstate or foreign commerce . . . ." S. 3778, 85th Cong., 2d Sess. (Emphasis added.)

As the Court notes in its opinion, Senator Javits opposed this "net loss" standard. *Ante,* at 102. The Court, however, misses the import of Senator Javits' view, which, since it ultimately prevailed, is highly significant. The Senator objected on the ground that the net loss criterion would authorize the discontinuance of any intrastate commuter train which, considered by itself, showed a net loss. He noted that under the proposal, whenever a net loss was shown, discontinuance could follow regardless of whether that loss unduly burdened interstate commerce. The Senator analyzed the proposed bill in a manner most relevant to the present case:

"It is my view, as the bill is now written, that question of law [as to the meaning of 'net loss therefrom'] will be decided in terms of a net loss on the particular section of a railroad which is sought to be discontinued, rather than the net loss on the total operations of the carrier of which that section of the road is a part." 104 Cong. Rec. 10847.

Senator Javits concluded that the bill should be amended to insure that the ICC be given a "balanced authority to deal with the situation, *both* in respect to losses *and* in respect to the public in the way of convenience and necessity." *Id.,* at 10848. (Emphasis added.) Senator Smathers, a sponsor of the proposed bill, did not deny the accuracy of Senator Javits' interpretation. Indeed,

Senator Smathers responded: "We construe the words 'net loss' to mean the loss from the particular operation the railroad is rendering." *Id.*, at 10849. Although Senator Javits was initially unsuccessful in his efforts to defeat the passage of the net loss provision, his arguments prevailed, as the Court notes, both in the House and in the final bill.

On the floor of the House, Representative Harris, Chairman of the House Interstate and Foreign Commerce Committee, offered an amendment deleting the net loss clause. It was argued that the bill would:

> "without this amendment, put the public entirely at the mercy of the railroad by establishing a new standard for the discontinuance of train service by a mere showing of a loss in the operation of any train. . . . We cannot go so far afield as to say that unless every single item of service shows a profit the railroad can discontinue any service regardless of public convenience and necessity." *Id.*, at 12547–12548.

The deleting amendment prevailed in the House, and at Conference the "net loss" provision of the Senate bill was abandoned in favor of the House proposal. Congress, therefore, in acting on the recommendations of Senator Javits and Congressman Harris specifically rejected the proposed net loss standard. The Court today, however, appears to adopt in substantial measure the rejected standard.[4] If, as the Court holds, the Commission need

---

[4] The report of the hearing examiner, which was accepted by the Commission and is now approved by the Court, made it clear that a net loss standard was utilized:

"At the hearing, protestants emphasized the fact that petitioner's net railway operating income in 1960 was $36,107,599, and that its net income alone from freight operations on the line between Greensboro and Goldsboro averages $630,000, thus contending that the overall prosperity of the petitioner, as well as its intrastate freight opera-

give "little or no weight" to the overall prosperity of the carrier and no consideration whatever to the profitability of its total intrastate operations, it would seem that the governing criterion in determining whether interstate commerce is unduly burdened is the "net loss" on a particular passenger train.[5]  This certainly does not allow the

tions, must be given effect in the disposition of the issues involved herein.  With these contentions, the examiner disagrees.  The legislative history of section 13a (2) indicates that the purpose thereof is to permit the discontinuance of the operation of services that *'no longer pay their way* and for which there is no longer any public need to justify the heavy financial losses involved.'  (S. Rep. 1647, 85th Cong.).  (Emphasis supplied).  In considering a somewhat similar contention, in *Southern Pacific Co.—Partial Discontinuance of Passenger Trains, Los Angeles, etc.* [312 I. C. C. 631], the Commission made the following pertinent statement:

" 'Nowhere in section 13a (2) or elsewhere in the law is there any requirement that the prosperity of the intrastate operations of the carrier as a whole, or any particular segment thereof, must be given effect in determining whether the operation of an individual intrastate train imposes an unjust and undue burden on interstate commerce.  To hold otherwise would be contrary to the apparent intent of the Congress.'

"In this same connection, the argument that losing passenger operations must be supported by constantly increasing freight rates is also untenable.  In rejecting this argument, the Commission stated that such 'theory of regulation would not be consonant with the national transportation policy, and would be fraught with disastrous possibilities.' *Great Northern Ry. Co. Discontinuance of Service*, 307 I.C.C. 59, 61.  Similarly, the fact that petitioner's system operations are profitable is entitled to little or no weight. . . ."

[5] This does not imply that either the Commission or the Court has failed to acknowledge that a carrier must show that public convenience and necessity will permit the requested discontinuance.  However, as I have indicated, *supra,* at 107, unless the Commission relates this finding as to public convenience to an appropriate consideration of the burden issue, the availability of alternative means of transportation coupled with the fact of losses on diminished passenger traffic will suffice to sanction discontinuances in virtually all cases.

ICC "a balanced authority to deal with the situation, *both* in respect to losses *and* in respect to the public in the way of convenience and necessity."

The result intended by Congress certainly cannot be achieved by allowing the Commission to make a final ruling on a discontinuance application without considering the question of undue or unjust burden.[6] A "balanced authority" for the ICC surely means that before overriding state action and authorizing the discontinuance of a wholly intrastate passenger train, the Commission must consider all substantial evidence presented by the parties and bearing upon whether the discontinuance is consistent with public necessity *and* whether the continued operation will constitute an unjust and undue burden upon interstate commerce. In making this determination the factors for the Commission to consider necessarily include the character and population of the territory served; the passenger traffic or lack of it; the alternative transportation facilities; the losses on the passenger operation as compared with the revenue from freight on the particular line and the revenue from intrastate business as well as the profitability of the railroad as a whole.[7]

The requirement that the Commission consider such factors certainly does not mean that it is precluded from

---

[6] *Colorado* v. *United States,* 271 U. S. 153, 168, "The benefit . . . of the abandonment must be weighed against the inconvenience . . . . Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce."

[7] The conclusion that § 13a (2) contemplates the weighing of such factors is reinforced by the use of the same balancing approach under §§ 1 (18), 1 (20), of the Interstate Commerce Act, 41 Stat. 477, 478, as amended, 49 U. S. C. §§ 1 (18), 1 (20). These provisions, enacted in 1920, empower the ICC to permit abandonment of lines (as distinguished from particular trains), where continued operation of the

authorizing the abandonment of an uneconomic passenger train because the remainder of the railroad's intrastate or overall operations are profitable.[8]  It means only that in making its determination the Commission shall give appropriate consideration to all relevant factors. One factor or a combination may prove controlling but all must be considered in making the statutory determination.  This the Commission refused to do and, therefore, its isolated finding that public convenience and necessity would permit a discontinuance was insufficient, absent an appropriate consideration of the burden on commerce, to sustain its conclusion.

Although I agree, for the reasons stated, with the three-judge District Court in its interpretation of § 13a (2), I am nevertheless of the view that that court misconstrued its reviewing role in finding that the operation of the two trains between Greensboro and Goldsboro served the public need and constituted no burden on interstate commerce.  The court should not have determined this issue on the record before it but should have remanded the case for further proceedings by the Commission under the correct legal standard.  See, *e. g.*, *Interstate Commerce Comm'n* v. *J–T Transport Co., Inc.*, 368 U. S. 81, 93.

---

entire intrastate line would burden interstate commerce.  See *Colorado* v. *United States, supra; Transit Comm'n* v. *United States,* 284 U. S. 360.

[8] The ICC has never been precluded from authorizing abandonment of an uneconomic branch line (as distinguished from the particular trains) merely because the remainder of the railroad's intrastate operations were profitable.  See note 7, *supra*.