The **PEOPLE OF** the **STATE OF CALI-FORNIA,** and the **Public Utilities Commission of California, Plaintiffs,**

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants,

and

Union Pacific Railroad Company, Intervening Defendant.

Civ. 43057.

United States District Court
N. D. California, S. D.

June 1, 1966.

Richard E. Tuttle and William N. Foley, San Francisco, Cal., for plaintiffs.

Robert L. Wright, Acting Asst. Atty. Gen., Cecil F. Poole, U. S. Atty., San Francisco, Cal., and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., for the United States.

Robert W. Ginnane, Gen. Counsel, and Thomas H. Ploss, Atty., I.C.C., Washington, D. C., for Interstate Commerce Commission.

F. J. Melia, H. E. Roos, John J. Burchell, Omaha, Neb., and Brobeck, Phleger & Harrison, San Francisco, Cal., for Union Pac. RR. Co., intervening defendant.

Before BROWNING, Circuit Judge, and WOLLENBERG and ZIRPOLI, District Judges.

PER CURIAM.

The Interstate Commerce Commission permitted the Union Pacific Railroad Company to discontinue the "City of St. Louis," a passenger train operating between Los Angeles, California, and Ogden, Utah, and to make compensating changes in the schedule of the "City of Los Angeles," a similar Union Pacific train operating between the same points.

The Public Utilities Commission of the State of California asks us to annul the Commission's order. We think "there is warrant in the law and the facts for what the Commission has done" (United States v. Pierce Auto Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946)), and that its order must therefore be sustained.

Section 13a(1) of the Interstate Commerce Act, 49 U.S.C.A. § 13a(1), provides that if a railroad wishes to discontinue a train, or change its schedule, it may file notice with the Interstate Commerce Commission. The Commission may require the railroad to continue the existing operation or service if the Commission finds that the operation or service "is required by public convenience and necessity and will not unduly burden interstate or foreign commerce." Absent such a finding the railroad may put its proposed change into effect.

The Union Pacific filed notice that it intended to discontinue the "City of St. Louis," and combine the equipment of this train with that of the "City of Los Angeles," adjusting the operations of the latter to serve, on a revised time schedule, the points both trains had previously served.

After an extensive hearing the Commission issued an elaborate report (320 I.C.C. 493), concluding that continued operation of the "City of St. Louis" between Ogden and Los Angeles was not required by public convenience and necessity and would unduly burden inter-

state commerce; and that the proposed adjustments in the service and schedule of the "City of Los Angeles," simultaneous with discontinuance of the "City of St. Louis," would serve public convenience and necessity. The Commission therefore permitted the changes to be made.

The Commission's conclusions were based upon a number of subsidiary determinations. The Commission found that the enlarged "City of Los Angeles" would provide the same passenger capacity as both trains had theretofore provided, and would serve each of the stations theretofore served; that changes in the time schedule previously available would be relatively small, involving only minor inconveniences and no increase in fares; and that adequate alternative means of common carrier transportation by air, rail, and bus were readily available to both local and transcontinental travelers.

The Commission noted that the Union Pacific's passenger service had operated at continuing, though declining, deficits during each of the ten years preceding 1962, and that in 1962 the deficit totaled $25,810,000. The Commission found that the proposed changes would result in a $1,455,000 annual increase in the net income of the carrier. Of this total, $85,000 represented an out-of-pocket deficit of $60,000, plus $25,000 in savable switching costs, directly attributable to the operation of the "City of St. Louis." The remaining $1,370,000 was computed by subtracting from the total cost of operating both trains (1) the estimated operating costs of the enlarged "City of Los Angeles," and (2) the setimated loss of passenger and mail revenue expected to result from the change in schedule.

Summarizing, the Commission said: "The sizeable savings which the proposed rearrangement of trains makes possible would have no appreciable adverse consequences upon the traveling public. On such basis, continuation of [the "City of St. Louis"], and the failure to institute the changes pertaining to [the "City of Los Angeles"], would constitute a drain upon the financial resources of the carrier, and as such would impose an unnecessary and undue burden upon interstate commerce." [1]

Plaintiff's principal argument is that the Commission erred in weighing the public need for continued operation of the "City of St. Louis" against the estimated increase in net income which would result from the consolidation of the two trains. Plaintiff contends (1) that under the statute the Commission must find that continued operation of a train would not burden interstate commerce, and must require that the service be continued, unless the particular train is itself being operated at an out-of-pocket deficit, and (2) that the burden upon interstate commerce must be measured solely by the amount of this out-of-pocket deficit.

The suggested limitations upon the Commission's authority do not appear in the language of the statute. As we have noted, section 13a(1) provides that the Commission may require continuance if it "finds that the operation or service of such train * * * is required by public convenience and necessity and will not unduly burden interstate commerce." There is no hint in this broad language that continued operation can "unduly burden" commerce only if, and to the extent that, past operations have produced a net deficit. Indeed, the section applies broadly to any "discontinuance or change, in whole or in part, of the operation or service of any train or ferry," and the standard plaintiff suggests could hardly be applied to every minor change

1. The Commission found that many employees of the carrier would be adversely affected by the changes, but concluded that "the adverse effect upon the employees would not be so drastic that the anticipated advantages to the carrier and to the public generally would be overshadowed." Organizations representing the employees participated in the proceedings before the Commission, but did not join in the present suit.

in any segment of a carrier's operation or service.

But plaintiff argues that the gloss which it puts on the statutory language is required by its legislative history and by the decision of the Supreme Court in *Southern Ry. v. North Carolina*, 376 U.S. 93, 84 S.Ct. 564, 11 L.Ed.2d 541 (1964). The problem presented to the Supreme Court in the *Southern Ry.* case was whether the Commission could find that the continued operation of two deficit-producing passenger trains constituted an undue burden on commerce within the meaning of the statute, even though the carrier might be making profits from freight operations on the same line. The Court held that the Commission could so find. The Court pointed out that Congress "was addressing itself to a problem quite distinct from that reflected by overall unprofitable operation of an entire segment of a railroad line" (376 U.S. at 100, 84 S.Ct. at 568) and "was primarily concerned with the problems posed by passenger services for which significant public demand no longer existed and which were consistently deficit-producing, thus forcing the carriers to subsidize their operation out of freight profits." 376 U.S. at 101, 84 S.Ct. at 569.

That the statute permits the Commission to find that continuance of a passenger service would unduly burden commerce even though freight traffic over the same line was profitable does not argue for the quite different conclusion that the Commission may only find such a burden if the particular passenger service is itself deficit-producing. Thus, the precise holding of *Southern Ry.* is of no aid to plaintiff.

The rationale of the Supreme Court's opinion also argues against plaintiff's position, for the Court emphasized the breadth of the discretion vested in the Commission. The Court said, "All that need properly be considered under this standard, as both the language and history of § 13a(2) thus make abundantly clear, is what effect the discontinuance of the specific train or service in question will have upon the public convenience and necessity and upon interstate operations or commerce." 376 U.S. at 104, 84 S.Ct. at 570.

During its consideration of section 13a, Congress referred to net loss passenger operations because such operations (particularly commuter services in metropolitan areas) were a prominent part of the problem with which Congress sought to deal; and in the *Southern Ry.* opinion the Court spoke in the same terms because the passenger service sought to be abandoned in the case before it was in fact deficit-producing. But this does not mean that either Congress or the Court intended to confine the section 13a remedy to this situation; and there is nothing in either the legislative history or the Court's opinion which would support such a reading of the statute.

The transportation Act of 1958 (of which the present 49 U.S.C.A. § 13a was a part) was directed to a large and critical problem. The nation's railroads faced a financial crisis. Net income and working capital had declined to such a point that the railroads were finding it difficult to borrow needed funds. Several large eastern carriers faced imminent bankruptcy. Congress recognized "that the railroads' financial condition results, in large measure, from the general passenger deficit of about $700 million * * *." S.Rep.No. 1647, June 3, 1958, p. 9. Similarly, the report of the House Committee stated, "[a] major cause of the worsening railroad situation is the unsatisfactory passenger situation. Not only is the passenger end of the business not making money—it is losing a substantial portion of that produced by freight operations." H.R.Rep.No.1922, U.S.Code Cong. & Admin. News, 85th Cong., 2d sess., p. 3467 (1958). See also 104 Cong.Rec. 12523, 12533, 12551.

The Transportation Act of 1958 included a number of remedial measures: a loan guaranty program was established to provide temporary financial assist-

ance; the rate-making standard was modified to provide that rates were not to be held up to a particular level to protect any other mode of transportation; the agricultural commodities exemption of section 203(b)(6) of the Interstate Commerce Act was narrowed; the "private carrier" exemption of section 203 (a)(17) was limited; and the Commission's jurisdiction over discontinuance and changes in railroad operation was enlarged by what is now section 13a.

Congress was thus concerned with the financial condition of the railroad system as a whole, and the remedies it provided were directed to that broad problem. Section 13a was not aimed at particular loss-producing operations as such; it was directed against continuing deficits in passenger operations as a whole. A rescheduling and consolidation of services which substantially reduces expenditures serves this objective quite as much as the elimination of a particular loss-producing train. Reducing Union Pacific's net expenses by combining the "City of St. Louis" with the "City of Los Angeles" has as real an impact, dollar for dollar, upon Union Pacific's ultimate net income and working capital as does the elimination of the out-of-pocket deficit incurred in operating the "City of St. Louis."

There is other evidence that Congress did not intend to limit the application of section 13a to operations which were in themselves deficit-producing. As section 13a was enacted in the Senate (104 Cong. Rec. 10867), and originally proposed in the House (H.R. 12832, 85th Cong., 2d sess., p. 9), it permitted the Commission to require continuation of a particular operation if the Commission found that operation (1) was required by public convenience and necessity, *and* (2) would not result in a net loss, *and* (3) would "not otherwise unduly burden interstate or foreign commerce." The second condition was eliminated to broaden the Commission's authority, as the Supreme Court pointed out in *Southern Ry.* The point, however, is that by the third condition Congress clearly contemplated that continuation of an operation or service might "unduly burden" interstate commerce, even though it would *not* result in a net loss.

■ Whether continuance of a train will "unduly burden interstate commerce" is a broad inquiry. It excludes no relevant consideration. If the discontinued train is not simply to be abandoned, but is to be replaced by adding to the equipment and revising the schedule of another train over the same route, savings from the consolidation do in fact reflect a burden which will be imposed upon commerce if the consolidation is not permitted. To ignore these savings would be to ignore the obviously relevant. We see no reason for imposing an illogical restriction—one which is at odds with the purpose of Congress—upon a statute which was deliberately drawn in broad and flexible terms.

■■ We conclude that the Commission, in deciding that the continuation of an operation under section 13a(1) would unduly burden interstate commerce may ground its conclusion upon the savings from consolidation which would result from the discontinuance, even though continuation of the operation would not result in a net loss to the carrier.[2]

2. As the Commission points out, from the beginning it has interpreted § 13a as permitting consideration of savable expenses, as well as actual losses. See, e. g., New York Central R.R., Discontinuance of Service, 307 I.C.C. 167, 169 (1959); Louisville & N. R. R., Discontinuance of Service, 307 I.C.C. 173, 181 (1959); Southern Pac. Co., Partial Discontinuance of Passenger Service, 307 I.C.C. 209, 214, 217 (1959); Texas & P. Ry., Discontinuance of Service, 307 I.C.C. 259, 262, 264 (1959); Chicago & N W. Ry., Discontinuance of Service, 307 I.C.C. 463, 471 (1959); Delaware, L. & W. R. R., Discontinuance of Service, 307 I.C.C. 627, 634 (1959). Later cases include Southern Pac. Co., Discontinuance of Passenger Trains, 317 I.C.C. 519. 523, 539, 546–47 (1961); Baltimore & O. R. R., Discontinuance of Passenger Trains, 317 I.C.C. 679, 681–82 (1963); Chicago & N. W. Ry., Discontinuance, 320 I.C.C. 85 (1963). In Chicago, South Shore &

Plaintiff's remaining contentions require only brief discussion.

■ Plaintiff complains because Union Pacific was allowed to introduce expense data but was not required to submit revenue data for the "City of Los Angeles." The expense data was relevant to a calculation of the savings which would result from consolidation of the two trains. The revenue data, through which plaintiff wished to show that the "City of Los Angeles" was already operating at a profit, was irrelevant for the reasons we have stated above.

Plaintiff contends that the expense data was required by section 43.5(h) of the Commission's procedural rules[3] because the "City of Los Angeles" was "involved" in the proceeding. If the Commission erred, the error was harmless for the reason already stated; and section 10 of the Administrative Procedures Act, 5 U.S.C.A. § 1009, provides that in reviewing administrative determinations "due account shall be taken of the rule of prejudicial error." See Brown Telecasters, Inc. v. FCC, 110 U.S.App.D.C. 127, 289 F.2d 868, 869 (1961).

■ Similarly harmless error, if error at all, were various judgments which the Commission made in weighing evidence relating to the out-of-pocket deficit in the operation of the "City of St. Louis," and in the Commission's ruling which plaintiff contends limited its opportunity to cross-examine with respect to various elements in the calculation of the deficit. Giving maximum effect to all that plaintiff might have shown, the difference could not have affected the result, since, as plaintiff states, "It is apparent that the decision is founded almost entirely" upon anticipated savings from the consolidation of the two trains, and very little upon the size of the out-of-pocket deficit in operating the "City of St. Louis."

■ Finally, we think the conclusions which the Commission drew from conflicting evidence as to the extent of the public need for continuation of the "City of St. Louis" were supported by substantial evidence.

The complaint must be, and hereby is, dismissed.

---

S. B. R., Discontinuance of Service, 312 I.C.C. 655, 662 (1961), the Commission said:

"The fact that some of the trains sought to be discontinued have operated at a profit should not necessarily require their continued operation, especially, where as here, the carrier can provide essentially the same service by its remaining trains and at the same time realize substantial economies. In general, the public is adversely affected by unnecessary transportation services and the resultant uneconomic expenditures. Moreover, it is apparent that the continuation of such unnecessary services constitutes a drain upon the financial resources of the carrier and imposes an undue burden on interstate commerce. Conversely, the elimination of such services will tend to promote efficiency in the carrier's operations and enable it to operate more economically, all of which will benefit the traveling public as well as the financial status of the carrier."

The Commission's interpretation is, of course, "entitled to great weight." United States v. American Trucking Ass'n, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

3. Title 49 C.F.R. § 43 sets out procedural rules to be followed in 13a proceedings. Sec. 43.5 provides:

"With each notice of a proposed discontinuance or change of operation or service, there shall be filed with the Commission a 'Statement in Relation to Proposed Discontinuance or Change of Train or Ferry Service' which, in the body thereof or in exhibits attached thereto and referred to therein, shall contain the following:

\*　　\*　　\*　　\*　　\*

(h) Financial results of operating the trains or ferries involved. \*　\*　\*"