It is not necessary for us to deal with the court's charge.

The judgments of conviction are reversed and judgments of acquittal are entered in favor of Professional Credit Corporation and Robert J. Budnick.

UNITED TRANSPORTATION UNION, PLAINTIFF-APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORTATION, COMMUTER OPERATING AGENCY, AND PENNSYLVANIA-READING SEASHORE LINES, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 9, 1970—Decided November 18, 1970.

Before Judges GOLDMANN, LEONARD and MOUNTAIN.

*Mr. Roger H. McGlynn* argued the cause for appellant (*Messrs. McGlynn, Stein & Eberiel,* attorneys).

*Mr. Blaine E. Capehart* argued the cause for respondent railroad (*Messrs. Capehart & Scatchard,* attorneys).

*Mr. Stephen Skillman,* Assistant Attorney General, filed a statement in lieu of brief for respondent Agency (*Mr. George F. Kugler, Jr.,* Attorney General, attorney).

The opinion of the court was delivered by

GOLDMANN, P. J. A. D.  Plaintiff union appeals from a decision of the Commuter Operating Agency of the Department of Transportation granting a petition brought by the Pennsylvania-Reading Seashore Lines (railroad) for permission to discontinue passenger trains Nos. 756, 773, 758 and 769. No. 758 is a morning train from Glassboro to Camden and 769 is the late afternoon train from Camden to Glassboro. No. 756 is the early morning train from Millville to Camden and 773 the late afternoon train in the opposite direction. The trains are designed and scheduled to serve commuter traffic between the respective points.

Following a public hearing the Agency rendered its decision authorizing the discontinuance of the trains, to be effective upon 30 days' notice to passengers. We granted the union's motion for a stay of the discontinuance pending appeal.

The sole issue raised by the Agency relates to the refusal of the examiner to require or permit evidence to be received as to the railroad's freight operations and revenues. When counsel for the union, on cross-examination of the railroad's expert witness Diffenderfer, inquired as to freight revenues, the reply was that "freight operation is not a part of this division." A protracted legal argument followed when coun-

sel asked the witness whether he had freight figures for the railroad. The argument concluded with the following exchange between the hearer and the witness:

MR. DAY, [the hearer] Does the PRSL, Mr. Diffenderfer, make money as a whole? Does it show a profit on its whole operation?
THE WITNESS: PRSL does not show a profit as a whole.
MR. DAY: Does it show any profits on its freight operation?
THE WITNESS: No, the freight operation shows some loss.

The witness explained that his information came from a report made by the railroad to the Interstate Commerce Commission under the Commission's rules for reporting the railroad's revenues and expenses.

The railroad had entered into a contract with the Department of Transportation pursuant to the Transportation Act of 1966 (*N. J. S. A.* 27:1A–1 *et seq.*), under whose terms it was required to furnish specified passenger service. Such an agreement permits the carrier, during the life of the contract, to apply for changes in passenger service and applicable fares, including a decrease in the number of trains. *N. J. S. A.* 27:1A–24. That section of the statute directs that the agency, prior to making any determination with respect to such an application, shall hold a public hearing on notice. The statute further provides that:

\* \* \* In acting on any such petition the agency shall give due consideration to the following factors:
(a) The availability of alternative means of public transportation.
(b) The potential cost of continuing the service sought to be curtailed or discontinued.
(c) The cost to the State of providing alternative transportation facilities either by common carrier or highway improvement.
(d) The resulting effect on State and local population trends, economic values and tax revenues.

As was said in *Brotherhood of R. R. Trainmen v. Central Railroad Co. of N. J.*, 47 *N. J.* 508 (1966), the problem of passing upon an application for discontinuance of certain passenger trains is basically an administrative one.

The experience of the Commissioner [here, the Agency] in dealing with the very difficult task of protecting the public interest in a particular area of passenger travel and at the same time serving the greater public interest of preserving the over-all system of railroad passenger service, must carry considerable weight on judicial review. A presumption of validity is accorded his orders, and a person challenging them has a heavy burden of demonstrating they have no substantial support on the facts. * * * [at 516–517]

If the subject is debatable, the Agency's determination must ·be upheld; this court can interfere with a determination only when it is plainly demonstrated to be arbitrary. *In re Petition of Erie-Lackawanna R. R. Co.,* 48 *N. J.* 567, 570 (1967). The rule thus applied in discontinuance cases is simply a specific application of the broader rule that in general limits appellate review of an administrative ruling to a determination of whether the administrative agency's action is supported by substantial credible evidence present in the whole of the record.

As *N. J. S. A.* 27:1A–24 makes clear, the Legislature has set out the criteria to be considered in a discontinuance proceeding. Examination of the record discloses that the testimony offered by the railroad carefully covered each of the enumerated factors. We therefore conclude that there is substantial credible evidence present in the whole of the record to support the Agency's determination. Alternative means of public transportation are available. The potential cost of continuing the four trains would result in a substantial net loss; Diffenderfer testified that the trains average 29, 31, 17 and 12 passengers, respectively, producing only $10,998 in income for a six-month period, resulting in a net loss of $106,781. (On a fully allocated basis, the total 1969 passenger deficit was $1,081,879, after consideration of the State's contract payments.) Even if every seat on the four trains was occupied, there would still be a deficit in the passenger service.

The record also establishes that the granting of the application to discontinue the trains will not result in any expenditure by the State in providing alternate transporta-

tion facilities. Finally, the record supports the Agency's determination that there would not be any appreciable adverse effect on population trends, economic values and tax revenues.

In cases decided before the adoption of the Transportation Act of 1966, it was stated that the financial success of the railroad as a whole is one of the important elements to be considered, *In re N. J. & N. Y. R. R. Co.*, 12 *N. J.* 281, 289 (1953), and that on an application for discontinuance the railroad's freight revenues are not to be overlooked, *In re Central R. R. Co. of N. J.*, 29 *N. J. Super.* 32, 34 (App. Div. 1953); *Susquehanna Transit Commuters Ass'n v. Board of Public Utility Comm'rs*, 55 *N. J. Super.* 377, 393 (App. Div. 1959). *In Pennsylvania R. R. Co. v. Board of Public Utility Comm'rs*, 48 *N. J. Super.* 216, 226 (1957), we said that a railroad may not benefit from its lucrative freight business and at the same time disavow its obligation to provide adequate passenger service because it finds it unprofitable to do so.

However, in *Bayonne v. Palmer*, 47 *N. J.* 520 (1966), plaintiffs contended that the railroad had to continue its passenger service, no matter how great the monetary loss, so long as it continued its freight service at a profit. The court (at 526) noted that it could not be said with any degree of certainty or beyond reasonable doubt that a railroad carrying passengers and freight cannot abandon all or part of its passenger service if it is suffering a substantial continuing financial loss and if there has been a substantial decrease in public demand for its service. It went on to say (at 529), after referring to *Southern Ry. Co. v. North Carolina*, 376 *U. S.* 93, 84 *S. Ct.* 564, 11 *L. Ed.* 2d 541 (1964), and the passage by our Legislature of *L.* 1962, *c.* 191, and *L.* 1964, *c.* 88 (the predecessors of *L.* 1966, *c.* 301 and *L.* 1967, *c.* 71, here involved), that

\* \* \* it cannot be said to be clearly unreasonable for our legislators to doubt that such carriers would be compelled to continue the intrastate [passenger] service in whole or in part simply be-

cause the freight operations were in some measure profitable, or even sufficiently profitable to produce some over-all net profit on the combined passenger and freight service. * * *

Continuing, the court then quoted from the *Southern Ry. Co.* case, as follows:

* * * neither the profitability of such freight operations as are fortuitously conducted on the same line as a given passenger service nor the profitability of all operations within any given State bears any practical relationship either to the public's need for the service in question or to the burden which the deficit imposes on interstate commerce.

In the exercise of our original jurisdiction we have examined the railroad's annual reports for 1967, 1968 and 1969 filed with the Interstate Commerce Commission and our Department of Public Utilities. Net railway operating income show losses in those years of $3,785,056, $3,926,440 and $3,769,153, respectively. Of these losses, total freight service accounted for $2,558,775, $2,840,894 and $2,687,274, for the respective years. Thus, the railroad not only showed substantial losses in passenger service, but also in its freight service.

The Agency's determination is accordingly affirmed.