BROTHERHOOD OF RAILROAD TRAINMEN, BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN AND BROTHERHOOD OF LOCOMOTIVE ENGINEERS, APPELLANTS, v. CENTRAL RAILROAD COMPANY OF NEW JERSEY, A CORPORATION, AND DWIGHT R. G. PALMER, COMMISSIONER, NEW JERSEY STATE HIGHWAY DEPARTMENT, RESPONDENTS.

Argued January 11, 1966—Decided June 29, 1966.

510

*Mr. James M. Davis, Jr.* argued the cause for appellants (*Messrs. Powell & Davis,* attorneys).

*Mr. Stephen B. Wiley* argued the cause for respondent Central Railroad Company of New Jersey (*Messrs. Meyner & Wiley,* attorneys; *Mr. Wiley* of counsel; *Mr. Dominick R. Velri* on the brief).

*Mr. Alan B. Handler,* First Assistant Attorney General, argued the cause for respondent, Commissioner, New Jersey State Highway Department (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Handler* of counsel and on the brief).

The opinion of the court was delivered

PER CURIAM. The Central Railroad Company of New Jersey petitioned the Commissioner of the State Department of Highways under *Chapter* 88, *L.* 1964; *N. J. S. A.* 48:12A–16.1 *et seq.* for leave to discontinue weekday train 101 from Jersey City to Phillipsburg, trains 107, 104 and 194 between Raritan and Phillipsburg, trains 3339, 3303 and 3322 between Jersey City and Bay Head Junction, train 444 from Raritan to Westfield, and train 436 from Raritan to Jersey City, *Saturday* trains 3369, 3353 and 3356 between Jersey City and Bay Head Junction, train 1101 from Jersey City to Phillipsburg, train 5056 from Atlantic Highlands to Matawan, *Sunday* and *holiday* trains 3373 and 3386 between Bay Head Junction and Jersey City, train 2403 from Jersey City to Raritan, trains 2199 and 2194 between Hampton and Phillipsburg, train 5086 from Atlantic Highlands to Matawan, to shorten the operation of trains 1107, 1104 and 1194, and to discontinue certain ferry service.

A public hearing was held on the petition pursuant to *section* 9 of the statute, *L.* 1964, *c.* 88, § 9; *N. J. S. A.* 48:12A–16.9. Evidence in support thereof was adduced by Central; no proof in opposition was offered by appellants Brotherhoods. Their participation consisted principally in the questioning of the railroad's witnesses and documents, and the presentation of the contention that *Chapter* 88, *L.* 1964, did not give the Commissioner power to authorize discontinuance of trains. No users of the service sought to be discontinued appeared in opposition.

At the hearing Central established its poor financial history over a number of years, but particularly since 1957, the last year it earned a profit. In that year the net profit was $143,-000. Thereafter its annual net losses were:

| | |
|---|---|
| 1958 | $2,000.000. |
| 1959 | 2,900,000. |
| 1960 | 4,200,000. |
| 1961 | 7,100,000. |
| 1962 | 7,400,000. |
| 1963 | 6,100,000. |
| 1964 | 8,300,000. |
| 1965 (3 months) | 2,321,000. |

Since 1960 the State of New Jersey in order to preserve essential commuter passenger service has made annual contract payments to Central ranging from a high of somewhat in excess of $1,500,000 to a low of $1,104,006 for the fiscal year 1960–1961.

A further blow fell in 1965. The Post Office Department notified Central that the mail carriage service provided for United States Post Office would be terminated on June 26, 1965. Termination actually occurred on that date. The revenue from that service was $1,000,000 annually, plus $9,800 annually from certain rent also paid by the Government in connection therewith. Its loss, of course, worsened the financial plight of the railroad. Some relief was sought through the curtailment or discontinuance of the trains specified in the petition under consideration. All of the passenger trains

involved carried mail as well as passengers. The revenue from these trains for mail and passenger service totaled $500,000 annually, only $62,257 coming from the passenger service. The latter sum represented 1.17% of the total 1964 passenger revenue, although the trains affected here represent 18.46% of the total Central passenger service miles traveled in New Jersey. The proof showed also that even if the permission prayed for is granted as to all trains involved Central would still have an annual net loss of approximately $600,000 from discontinuance of the mail service because certain existing labor agreements require gradual severance of the employees involved. Plainly loss of the mail revenue increased and aggravated the effect of the deficit being experienced annually on passenger service.

The Commissioner recognized the serious financial condition of the railroad, and the substantial prospect of a net operating loss of over $9,000,000 for 1965. He balanced the relatively meager passenger use of the trains involved, the inconvenience resulting to some of the users, and the existence of alternate Pennsylvania railroad service in some instances, against the grave probability of endangering the more necessary remainder of the Central operation. On doing so he concluded that the particular trains involved did not represent passenger service that was essential in the public interest. See *Sprissler v. Pennsylvania-Reading Seashore Lines*, 45 N. J. 127, 135–136 (1965). Accordingly he granted the permission as requested by the railroad, imposing certain minor alleviative directions.

The Brotherhoods appealed from the Commissioner's order and we certified the matter before it was argued in the Appellate Division. Appellants' argument is limited to challenging the propriety of the permission to discontinue trains 3322, 3356 and 3386. There are some ambiguous statements in the brief which may be intended to qualify this limitation in some way. In order to dispose of such possibility, we pause to say the record adequately sustains the Commissioner's action as to all other trains covered by his order.

## I.

■ Train 3356 is a Jersey seashore train, but not a commuter train. It runs on Saturday only and northbound only from Bay Head Junction to Newark and New York. It leaves Bay Head at 8:27 A. M. and carries 101 paying passengers on the entire run on an average Saturday. Its annual mileage is 3156 miles, a miniscule part of Central's total annual passenger miles. Substantially adequate alternate trains are available. Central has trains from Bay Head at 7:24 and 10:59 A. M.; Pennsylvania trains (which run over the same tracks below Perth Amboy) leave Bay Head at 7:58 and 9:10 A. M. In our judgment the proof does not warrant judicial interference with the order as to train 3356.

■ Train 3386 runs from Bay Head Junction north only on Sundays and holidays (three holidays). It leaves at 7:57 P. M. and carries more passengers in the summer than winter. On the four days observed, two in December and two in July, 1964, the average number transported over the entire run was 94 paying passengers ranging from a high of 186 on July 19, to a low of 41 on December 6.

There is substantially alternative means of travel. Central has a train out of Bay Head at 6:46 P. M., one hour and eleven minutes earlier. Pennsylvania runs one from the same station at 7:21 P. M., 36 minutes earlier. Although some few passengers may suffer some slight inconvenience by the withdrawal of train 3386, in our view the Commissioner was justified in finding the greater public interest is served by his action in allowing it to be done.

■ Train 3322 is a weekday only train which begins its run out of Bay Head Junction to New York at 4:00 P. M. The substantial commuter service from the shore is in the early morning (Central, first train 4:27 A. M., six trains thereafter before 9:00 A. M.; Pennsylvania, first train 5:39 A. M., seven trains thereafter to 9:10 A. M); to the shore it moves substantially between 3:15 P. M. and 7:00 P. M. Central quite properly argues that a 4:00 P. M. train from the shore

is not part of the ordinary commuter traffic. An average of 104 revenue passengers is served on the entire run.

The record shows that a Pennsylvania train leaves Bay Head at 5:09 P. M. and makes 21 of the 27 stops train 3322 would make. Four of the remaining stops, Hazlet, Barber, Port Reading and Bayway represent practically no traffic—an occasional one or two persons. At the remaining two stations, Elizabethport an average of five persons boarded the train and 20 alighted; at Bayonne, an average of three boarded and 23 got off. It appears also that although the Pennsylvania train leaves Bay Head an hour and nine minutes later it arrives at Elizabeth only 24 minutes later than Central train 3322.

It does not seem necessary to detail other factors involving trains of the Central and Pennsylvania whose schedules it is suggested can be adjusted to alleviate in some measure the inconvenience a relatively few passengers may undergo if train 3322 is discontinued. It is sufficient to say the Commissioner directed Central (1) "to discuss with the Pennsylvania Railroad possible changes in seashore service, * * *, and (3) institute faster schedules on some of the remaining train service."

Another matter should be noted. The Commissioner permitted two Central southbound shore trains, 3303 and 3339, to be discontinued, because the former carried an average of 11 revenue passengers and the latter carried seven. If 3322 is not discontinued a southbound counterpart train would have to be run to Bay Head some time earlier. In the light of the experience of trains 3303 and 3339, a counterpart train would represent almost a total expense item.

The problem of passing upon applications for discontinuance of certain passenger trains is basically an administrative one. The experience of the Commissioner in dealing with the very difficult task of protecting the public interest in a particular area of passenger travel and at the same time serving the greater public interest of preserving the over-all system of railroad passenger service, must carry

considerable weight on judicial review. A presumption of validity is accorded his orders, and a person challenging them has a heavy burden of demonstrating they have no substantial support on the facts. Appellants have not made such a showing here. His order with respect to train 3322 cannot be said to be arbitrary on the evidence submitted to us.

## II.

Appellants contend further that the order under review is void because (1) the authority of the Commissioner to make it had expired as of July 1, 1964 by reason of the repeal of *Chapter* 66, *L.* 1960 contained in *Chapter* 88, *L.* 1964, and (2) because the Commissioner's jurisdiction depends upon *Chapter* 88, *L.* 1964, which is unconstitutional.

With regard to the first contention it must be conceded that the interrelation between *Chapter* 66, *L.* 1960, *Chapter* 58, *L.* 1964 which referred to the 1960 act, and *Chapter* 88, *L.* 1964 which repealed *Chapter* 66, *L.* 1960 as of July 1, 1964, creates some ambiguity as to the effect of the repealer. But it is inconceivable that the Legislature in enacting *Chapter* 88, *L.* 1964, which was a general revision of the 1960 law concerning the program for the preservation and continuance of New Jersey railroad passenger service by means of certain contractual relationships between the State and railroads operating such service, intended by the section repealing the 1960 act to withdraw from the Commissioner power expressly conferred upon him by *section* 9 of *chapter* 88.

The history of *Chapters* 58 and 88, *L.* 1964, shows beyond doubt the Legislature never intended by enacting the latter to cancel the authority given by the former to the Commissioner to grant leave to a railroad operating a passenger service under contract with the State to terminate part of the service. *Chapter* 58, *L.* 1964, amended the Public Utility Act, *N. J. S. A.* 48:2–24 to clarify and to remove any possible appearance of conflict between the authority of the Board of

Public Utility Commissioners and that of the Commissioner to authorize discontinuances of passenger service being operated under contracts made between the State and the railroads. See *Sprissler v. Pennsylvania-Reading Seashore Lines, supra,* 45 *N. J.,* at *p.* 131. The Commissioner had been given such power expressly under *Chapter* 66, *L.* 1960, to rule upon such applications where such contracts existed. Undoubtedly if *Chapter* 58, *L.* 1964, had never been adopted, the section of the Public Utility Act referred to would have been considered in *pari materia* with *Chapter* 66, *L.* 1960, *sections* 5(c) and 10 and in "contracted service" cases (see *section* 2(f), *Chapter* 66, *L.* 1960) the exclusive power of the Commissioner to grant service changes or discontinuances would have been recognized. The precautionary action represented by *Chapter* 58, *L.* 1964, referring as it did to the 1960 act, was intended to establish this beyond doubt.

�OCR *Chapters* 58 and 88, *L.* 1964, were introduced in the Legislature on the same day, April 20, 1964. Both passed the Senate the same day, April 27, 1964. *Chapter* 58 passed the Assembly May 11, 1964, and was approved May 18, effective immediately. *Chapter* 88 was amended in the Assembly and passed as amended on May 11, 1964; it repassed the Senate as amended on May 18, was approved May 29 and became effective by its terms on July 1, 1964. *New Jersey Legislative Index 1964,* Final Edition, *Vol.* 51, No. 20 (1965). Thus it is plain that the Legislature was aware of the purpose of both chapters and could not have intended the Chapter 58 clarifying amendment to the Public Utility Act, obviously designed to implement the authority theretofore conferred on the Commissioner, to be qualified or withdrawn by *Chapter* 88 which for all practical purposes was adopted at the same time. Obviously the reference in *Chapter* 58 to *Chapter* 66, *L.* 1960 "as amended and supplemented," must be considered a mere inadvertence or as surplusage. Whatever strictly technical conclusions one might wish to draw from the two chapters, obviously the Legislature intended the Commissioner to have the authority to grant leave to railroads under passenger carriage

contracts with the State to discontinue trains no longer necessary in the public interest. Assuming that the effect of the repealer of *Chapter* 66, *L.* 1960 (even though such result comes about by legislative inadvertence and not deliberate intention) is to empty *Chapter* 58, *L.* 1964, of potency, *Chapter* 88, *L.* 1964 remains. *Chapter* 88 obliges railroads supplying passenger service under a contract authorized thereby, to continue such service during the contract period, and to refrain from seeking leave from any agency or court, State or Federal, to curtail or discontinue the agreed service during such period without the written permission of the Commissioner. The chapter also empowers the Commissioner to grant curtailment or discontinuance of the contracted passenger service, after hearing on notice to interested parties. The statutory scheme which eventuates is simply this: *Section* 24 of the Public Utility Act and *Chapter* 88, *L.* 1964, are in *pari materia,* just as *Section* 24 and *Chapter* 66, *L.* 1960 were before the latter's repeal. Thus the Board of Public Utility Commissioners continues to have the authority to deal with petitions for curtailment or discontinuance of the conventional passenger service engaged in under the railroad franchise. On the other hand by virtue of the express legislative grant under *Chapter* 88, *L.* 1964, in contracted passenger service cases, the Commissioner alone can entertain such applications. Consequently his order in this case was within his statutory power.

 We find no legal substance in the second contention presented by appellants, *i. e.* that *Chapter* 88, *L.* 1964, is unconstitutional because the payments it authorizes to be made by virtue of a contract executed thereunder violate *Article* VIII, § III, *par.* 3 of the *State Constitution* forbidding donations or gifts of public money to a private corporation. That issue has been considered and rejected in *City of Bayonne v. Palmer,* 47 *N. J.* 520 (1966), filed contemporaneously with this opinion.

### III.

For the reasons stated the order of the Commissioner is affirmed, and the consent stay thereof granted by the Appellate Division is dissolved.

*For affirmance* — Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL and SCHETTINO — 5.

*For reversal* — None.