CITY OF BAYONNE, A MUNICIPAL CORPORATION OF NEW JERSEY, *ET AL.*, PLAINTIFFS-APPELLANTS, v. DWIGHT R. G. PALMER, COMMISSIONER OF THE STATE HIGHWAY DEPARTMENT OF NEW JERSEY, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued June 7, 1966—Decided June 29, 1966.

*Mr. Joseph M. Jacobs* argued the cause for plaintiffs-appellants City of Bayonne and others (*Messrs. Harrison & Jacobs,* attorneys and of counsel).

*Mr. Alan B. Handler,* First Assistant Attorney General, argued the cause for defendants-respondents Dwight R. G. Palmer and others (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Handler* of counsel and on the brief).

*Mr. Stephen B. Wiley* argued the cause for defendants-respondents Central Railroad of New Jersey and others (*Messrs. Meyner & Wiley,* attorneys; *Mr. Wiley* of counsel, and *Messrs. Dominick R. Vetri* and *Donald M. Malehorn* on the brief).

The opinion of the court was delivered

PER CURIAM. The judgment is affirmed substantially for the reasons expressed by Judge Matthews in the Superior Court, Chancery Division. *City of Bayonne v. Palmer,* 90 *N. J. Super.* 245 (*Ch. Div.* 1966).

I.

On this appeal plaintiffs renew their charge that the contracts between the Commissioner of the State Highway De-

partment and the railroads are violative of *Article* VIII, § III, *par.* 3 of the State Constitution. More specifically they assert that payment by the State of any moneys called for under the contracts (details of which are outlined in the opinion below, 90 *N. J. Super.* 264–268) constitutes a donation of public funds to a private corporation, which is prohibited by the article. The contention is predicated primarily upon *Wilentz v. Hendrickson,* 133 *N. J. Eq.* 447 (*Ch.* 1943), affirmed 135 *N. J. Eq.* 244 (*E. & A.* 1944). We agree with the Chancery Division that the case is clearly distinguishable.

*Wilentz v. Hendrickson* involved an attack upon the constitutionality of certain statutes authorizing a compact by the State to remit accrued and unpaid interest on the full amount of delinquent taxes on the property of certain private railroad companies operating in New Jersey. The Chancery Division and the Court of Errors and Appeals declared the statutes unconstitutional because there would be no legal consideration for the contract authorized thereunder. More particularly both courts pointed out that the full debt of the railroads, consisting of taxes and accrued interest, was due, and collectible, and the State's right thereto vested. Consequently, an agreement for remission of the interest and to discharge the entire obligation in return for installment payment of the portion thereof due for taxes was without valid consideration and therefore void. Such payment was nothing more than the performance of an act which the railroads were already legally bound to do, and the formal undertaking to do so added nothing of legal substance in the way of *quid pro quo* for the State's remission. The agreement to discharge the interest portion of the debt therefore, was a gratuity, a gift or appropriation of public money to private companies and transgressive of *Article* I, § XX (now *Article* VIII, § III, *par.* 3) of the Constitution.

That situation is not present in the matter before us. The contracts between the Commissioner and the railroads, as authorized by *L.* 1962, *c.* 191, *N. J. S. A.* 48:12A–17 to 20, and *L.* 1964, *c.* 88, § 5, *N. J. S. A.* 48:12A–16.5, contain a

number of undertakings on the part of the carriers which are described in the opinion below. 90 *N. J. Super.* 264–268. The Attorney General and the railroads assert that these commitments and obligations constitute sufficient legal consideration for the promise by the State to pay the moneys called for by their agreements. And the railroads contend that since such payments rest upon a valid and not illusory or insignificant *quid pro quo,* they are not gifts or donations or appropriations of public money to a private company within the intendment of the Constitution. The trial court accepted defendants' position as sound and sustained the contracts. In approving that view we believe certain additional comments should be made with respect to one aspect of the statute which is made part of the contracts by reference.

*Section* 5 of the statute, *L.* 1964, *c.* 88, *N. J. S. A.* 48:12A–16.5, provides among other things, that the contract shall obligate the carrier:

"(c) During the term of the contract * * *, unless otherwise approved in writing by the commissioner, not to initiate, take or prosecute and to actively resist, any proceedings before any State or Federal agency or court for any order, approval, judgment, decree or other action impairing or limiting the rights, powers and capacity of the carrier to operate the contracted service and carry out and perform its obligations under said contract with respect to the contracted service".

The contract with Central Railroad Company recites that upon completion of the improvements to capital facilities listed therein and in similar agreements between the State and the Lehigh Valley and Pennsylvania Railroads, Central "will operate or cause to be operated [the stipulated] passenger carrying services for a period of not less than five years from their inauguration." The contract with the Lehigh Valley Railroad Company also contains similar provisions with respect to agreed periods of continuous operation. No contract between the State and Pennsylvania Railroad Company directly relating to consummation of the Aldene Plan was put in evidence. None seems to have been made. It does

appear, however, that in the general operational contracts between the State and Pennsylvania covering continuance of the latter's over-all intrastate passenger service, general provision was made for cooperation with Central and Lehigh with respect to use of such Pennsylvania facilities as might be necessary to accomplish the Aldene Plan. The testimony shows that certain necessary rental agreements had been made with respect to use of Pennsylvania's trackage and other facilities. Plaintiffs' attack on the constitutionality of the State's payments to Pennsylvania is necessarily directed against the series of general operational contracts respecting continuance of passenger service and against the statute which authorized them. Of course, the forbearance provision of the statute quoted above has been and is a part of all such contracts. See *L.* 1960, *c.* 66, § 5(c), *N. J. S. A.* 48:12A-5; *L.* 1962, *c.* 1, § 6, *N. J. S. A.* 48:12A-5.

Thus Central (taken for illustrative purposes) has agreed by virtue of the contract that it will continue the described passenger service for not less than five years. Also it has stipulated by reason of the section of the statute quoted, that it will refrain from abandoning or seeking leave or an order to abandon such passenger service (without the written permission of the Commissioner) from any agency or court, Federal or State, during that period. The Attorney General and Central maintain the railroad's agreement to operate the service for at least five years and to refrain from seeking an order to be relieved thereof for that period, of itself, constitutes adequate consideration for a valid contract with the State. On the other hand, plaintiffs say that the alleged consideration is illusory because Central has an inescapable legal burden to continue its passenger service so long as it continues its freight service. And they appear to contend that the appropriate State or Federal agencies would not permit abandonment of part or all of the passenger service for which some public need appears, no matter how great the monetary losses or how long they continue, particularly if the return on the freight business results (as is the case with the Pennsylvania

Railroad but not with Central) in an over-all profit on the entire operation. Therefore, they say that since Central's contractual undertaking is only to do what it is legally obliged to do as a railroad franchise holder, the State has received no sufficient *quid pro quo* for the agreed expenditure of public money. Consequently they reiterate that *Wilentz v. Hendrickson* is controlling.

Needless to say, if the law were clear, and the railroads' obligation, as asserted by plaintiffs, unmistakable, and no reasonable doubt existed on the subject, the contracts would lack validating consideration. Put another way, if the applicable law were so clear, unambiguous and free from doubt, that under the principle applied in summary judgment proceedings, judgment would have to go in favor of plaintiffs, this contract would have to be adjudged void. But it cannot be said with any degree of certainty or beyond any reasonable doubt that a railroad carrier of passengers or passengers and freight operating both interstate and intrastate cannot abandon all or part of its passenger service if a substantial continuing financial loss is being suffered thereon by the carrier, and if there has been a substantial decrease in public demand for the service.

Ordinarily the Board of Public Utility Commissioners has jurisdiction to entertain an application by a railroad which operates intrastate and interstate passenger facilities, to discontinue all or part of its intrastate passenger service *N. J. S. A.* 48:2–24. For a recent example of its exercise, see *In the Matter of the Petition of Erie-Lackawanna Railroad Company For Permission to Discontinue Its Suburban Passenger Service,* decided by the Board May 4, 1966. —— P. U. C. ——. Although the Board in that case refused to permit total abandonment of passenger facilities, it did authorize a significant curtailment thereof on the thesis of substantial decline in need and that "no business is required indefinitely to sustain financial losses."

In 1958 following a study of the operation of interstate railroads and their financial problems, Congress amended the

Transportation Act by adding among other things, 49 *U. S. C. A.* § 13*a*. The report accompanying the act noted that "A major cause of the worsening railroad situation is the unsatisfactory passenger situation. Not only is the passenger end of the business not making money—it is losing a substantial portion of that produced by freight operations." H. R. Rep. No. 1922, *U. S. Code Congressional and Administrative News* (1958), p. 3467. The report went on to say that local regulation by state agencies "of what has come to be a national problem has hampered the railroads from making some changes in their passenger train operations in line with changes in patronage, and has contributed greatly to the passenger deficit." So it was proposed to add a new *section* 13a to the act "whereby the railroads, at their option, may have the Interstate Commerce Commission, rather than State commissions, pass upon the discontinuance or change in the operation or service of any train or ferry", when such train or ferry is on a line of a railroad not located wholly within a single state. *Id., at page* 3468.

*Section* 13a(1) as adopted provides that any interstate carrier whose rights "with respect to the discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State * * *, are subject to any provision of the * * * statutes of any State 'or any regulation or order of * * * any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the [Interstate Commerce] Commission, and upon such filing shall mail to the Governor of each State in which such train or ferry is 'operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change." The carrier *may then "discontinue or change any such operation or service* pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph, *the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State*

*authority to the contrary notwithstanding."* 49 *U. S. C. A.* § 13a(1). (Emphasis added)

*Section* 13a(2) provides that:

"Where the discontinuance or change, in whole or in part, by a carrier * * * subject to [the Interstate Commerce Commission], of the operation or service of any train or ferry operated wholly *within the boundaries of a single State* is prohibited by the * * * statutes of any State or where the State authority having jurisdiction thereof shall have denied an application or petition duly filed with it by said carrier * * * for authority to discontinue or change, in whole or in part, the operation or service of any such train or ferry or shall not have acted finally on such application or petition within one hundred and twenty days from the presentation thereof, such carrier * * * may petition the Commission for authority to effect such discontinuance or change." 49 *U. S. C. A.* 13a(2). (Emphasis added)

After hearing the Commission may grant the permission sought upon finding that "(a) the present or future public convenience and necessity permit of such discontinuance or change, in whole or in part, of the operation or service of such train or ferry, and (b) the continued operation or service of such train or ferry without discontinuance or change, in whole or in part, will constitute an unjust and undue burden upon the interstate operations of such carrier * * * or upon interstate commerce." *Id.*

The House Report referred to above says *section* 13a provides a method and procedures to make it possible for railroad carriers subject to the Interstate Commerce Act "to discontinue or change, in whole or in part, the operation or service of trains or ferries operated by such carriers, notwithstanding otherwise applicable State laws." *U. S. Code, Congressional and Administrative News, supra, p.* 3486. No one disputes in the present case that Central Railroad Company of New Jersey is sufficiently engaged in interstate operations to be subject to the Interstate Commerce Act and may seek to take advantage of *Section* 13a(1) and (2) if it so desires.

The full impact of *section* 13a on interstate passenger and freight railroads which operate an intrastate passenger service has not been established. But as construed and applied in

*Southern Ry. Co. v. North Carolina,* 376 *U. S.* 93, 84 *S. Ct.* 564, 11 *L. Ed. 2d* 541 (1964), the New Jersey Legislature might reasonably believe it poses a substantial threat to the enforced continuance in whole or in part of intrastate operations of such carriers which no longer pay their way, which are consistently deficit-producing, and for which there is no longer sufficient public demand or need to justify the heavy financial losses involved. Moreover, as a result of *section* 13a and the United States Supreme Court view thereof, it cannot be said to be clearly unreasonable for our legislators to doubt that such carriers would be compelled to continue the intrastate service in whole or in part simply because the freight operations were in some measure profitable, or even sufficiently profitable to produce some over-all net profit on the combined passenger and freight service. Undoubtedly the over-all prosperity of a railroad is relevant to a determination of the degree to which a deficit resulting from a particular intrastate service constitutes an undue burden on interstate commerce. But, as the Court said in *Southern Ry. Co. v. North Carolina, supra:*

"* * * neither the profitability of such freight operations as are fortuitously conducted on the same line as a given passenger service nor the profitability of all operations within any given State bears any practical relationship either to the public's need for the service in question or to the burden which the deficit imposes on interstate commerce." 376 *U. S.*, at *p.* 103, *fn.* 16, 84 *S. Ct.*, at *p.* 570.

In the present proceeding it is not necessary for this Court to pass upon the application of *section* 13a or the limitation it or *Southern Ry. Co. v. North Carolina* imposes on a carrier's right to discontinue some or all intrastate service in any given situation. Nor is it necessary to express any view of the extent to which *section* 13a restricts the authority of our Board of Public Utility Commissioners. It is sufficient here to find that when *Chapter* 191 of the *Laws of* 1962 and *Chapter* 88 of the *Laws of* 1964 were enacted, reasonable ground existed for a belief by the Legislature (1) that intrastate passenger railroad service was vulnerable on an applica-

tion by an interstate carrier to discontinue it in whole or in part because of substantial diminution in public use of the service, and substantial annual losses arising therefrom, and (2) that the users, although not sufficient in number to make the service profitable, constituted a sufficiently large and economically significant segment of the commuting public to warrant legislative protective attention. If such finding can be made reasonably, and we have no doubt that it can and must be made on the existing record, it was within the competence of the legislative branch of the government acting in the public interest to seek out and adopt means to preserve the passenger service. The means adopted, as revealed by the 1962 and 1964 acts in question, was to offer certain monetary payments to railroad carriers in exchange for an agreement to continue to furnish specified passenger service for stipulated periods, and not to seek permission in any agency or court at the State or Federal level to discontinue such service in whole or in part except with the authorization or consent of the Commissioner of the State Highway Department. In the circumstances the issue for the courts is whether an undertaking by a railroad not to apply for leave to alter or abandon its passenger service, except as the contract with the Commissioner prescribes, constitutes a valid consideration for the monetary payment, or whether such payment is a gift of public money in violation of the Constitution. In our judgment the agreement for such forbearance by a railroad plainly reaches the status of adequate legal consideration, and thus the constitutional proscription relied upon by plaintiffs has no application.[1]

---

[1] As part of the contracts to coordinate, preserve and maintain necessary passenger service, provision was made for the railroads involved in the Aldene Plan to undertake certain improvements to capital facilities. These improvements (such as construction, reconstruction, relocation or rehabilitation in connection with passenger service of passenger stations and terminals, automobile parking facilities for railroad patrons, signal systems, equipment storage and service facilities, railroad passenger cars, locomotives, self propelled passenger carrying rail cars, and the like) were to be financed by the

## II.

Plaintiffs argue further that the Aldene Plan contract is invalid because by it the Commissioner "purports to authorize" Central Railroad Company to terminate passenger service at 33rd Street, Bayonne. More specifically they point out that at the time of execution of the contract the passenger service proceeded beyond 33rd Street to Jersey City and the ferry to New York located there. And they charge that since Central has agreed to operate its trains for not less than five years "between its Cranford and 8th Street and 33rd Street, Bayonne stations," the Commissioner has consented to the abandonment of the passenger service between 33rd Street and the New York ferry in Jersey City. Such abandonment, they claim, cannot be granted without a public hearing before either the Board of Public Commissioners under *N. J. S. A.* 48 :2–24 or the Commissioner under *L.* 1964, *c.* 88, § 9, *N. J. S. A.* 48 :12A–16.9 on proper notice to interested and adversely affected parties.

In the answer filed herein the Attorney General denies the claim that by the contract the Commissioner has authorized

State to the extent of funds appropriated for the purpose. Under the contracts Central and Lehigh agreed that on the completion of the improvements to the capital facilities by them and the other contracting railroads, they would furnish the described passenger services for a period of five years from their inauguration. (As has been indicated the agreement with Lehigh also contained provisions requiring continuous service for stipulated periods. So the particular issue may be discussed in terms of the Central contract.) Since no specific provision was incorporated respecting the rights of the State in the capital improvements at the end of the five-year period, plaintiffs claim that by implication they would become the property of the railroads unencumbered by any further obligation to the State with respect to carriage of passengers. This situation, they argue, lends additional force to their position that the financial assistance of the State to facilitate the capital improvements constitutes a donation of public money.

The undertaking of the State to share in the cost of the capital improvements was expressly authorized by the Legislature as part of the over-all plan to reroute, coordinate and preserve the passenger service as contemplated by the Aldene Plan and otherwise. *L.* 1962, *c.* 191, § 2; *N. J. S. A.* 48 :12A–18; *L.* 1964, *c.* 88, § 2(*h*) ; *N. J.*

the alleged termination of service beyond 33rd Street, and he refers to the contract for the specific commitments of the parties. In addition, he calls attention to the fact that the authority delegated to the Commissioner appears in *L.* 1962, *c.* 191, *section* 2 of which empowers him:

"* * * to contract with such carriers as shall be necessary to undertake improvements to capital facilities to provide connecting passenger service between the Central Railroad Company of New Jersey and service operated by or in connection with the Port Authority Trans-Hudson Corporation * * * by *rerouting* the Central Railroad Company of New Jersey passenger trains to operate between the Pennsylvania Railroad Station in Newark and terminal stations on the Central Railroad Company right of way * * *." *N. J. S. A.* 48:12A-18. (Emphasis ours)

He contends that the contract goes no further than this statutory authorization and on its face does not specifically author-

*S. A.* 48:12A-16.2(*h*). When Central agreed to provide necessary improvements to capital facilities—subject in all cases to the approval and substantial control of the Commissioner—in order to bring the Aldene Plan to fruition in the interest of furthering and preserving passenger service, and also agreed upon their completion to maintain such service for at least five years without application to any State or Federal court or agency to be relieved in part or in whole therefrom, the stipulations were ingredients of the valid contracts described in the text above. And for the reasons expressed above also, the railroads' obligation to bring about the Aldene Plan, as well as their affirmative undertaking to maintain the passenger service and to refrain from seeking relief therefrom except under the terms of the contract, without more, constituted adequate consideration for the State's financial assistance.

But there is more here than the exact words of the agreements reveal with respect to ownership of the improvements to capital facilities. It is obvious from the nature of the obligations assumed by the parties that decisions as to what improvements were to be made as well as the time of the making of the improvements were to be a continuing process and subject in large measure to the approval of the Commissioner. Moreover, it is obvious from the basic agreements that supplementary compacts dealing with these matters were within the contemplation of the parties. The Attorney General in an appendix to his brief added copies of supplements to the Central and Lehigh basic agreements with the Commissioner, and a copy of a long term agreement presently being negotiated with Pennsylvania Railroad Company containing, among other things, stipulations regarding

ize abandonment of Central's passenger service beyond 33rd Street, Bayonne. The position expressed in his brief is that the question whether such service is destined for eventual elimination is not settled by the challenged contract, and the problem, therefore, is not before the Court at this time.

Section 9, L. 1964, c. 88 referred to above provides that:

"Every carrier entering into a contract shall be obligated to continue during the term of the contract all passenger service as defined in section 2 and fares applicable thereto which it operated immediately prior to the effective date of the contract. The carrier shall have the right to petition the commissioner for changes in passenger service and applicable fares during the term of the contract. If such a petition involves a decrease in the number of trains, a substantial change in schedules or an increase in fares, the commissioner shall hold a hearing on notice. * * *" N. J. S. A. 48:12A–16.9.

At the oral argument the Attorney General treated this legislative mandate as properly to be applied (and we agree) if and when the railroad seeks to abandon the passenger service beyond 33rd Street. And he indicated that, although the question is not presented in this proceeding, an appropriate

---

ownership and use of capital improvements made and to be made. The Central supplement specifies that the facilities and equipment provided or constructed under the basic agreement shall be known as "Project Facilities"; "They shall be constructed by Railroad for the account of Commissioner and shall remain the property of Commissioner throughout the useful life of such facilities as determined in accordance with generally accepted accounting standards approved by Commissioner, which useful life in any event shall not exceed twenty years. Upon expiration of the useful life of Project Facilities, they shall cease to be Project Facilities and become the property of Railroad." It is provided further that if, during the Commissioner's ownership, such facilities are devoted substantially to non-passenger carrying services, the Commissioner may require the railroad within 60 days to purchase them at fair market value, or remove them within six months from the railroad's property, or require them to be sold and the proceeds paid to the Commissioner.

The Lehigh contract supplement requires such project facilities to be devoted to mass transportation service within the project area for their useful life, not to exceed 20 years. It is provided also that if sold during their useful life the proceeds shall be returned to the Commissioner, less costs of sale, or if the project facilities are devoted to uses other than mass transportation service the proportional

hearing will be given when and if the issue becomes real. Under the circumstances we do not consider that the matter of hearing has been disposed of by the Chancery Division opinion, and we do not undertake to rule upon it now.

## III.

The judgment appealed from is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL and SCHETTINO—5.

*For reversal*—None.

---

amount of the fair value of those otherwise used shall be returned to the Commissioner.

The basic contract being negotiated between the State and Pennsylvania Railroad Company, which only in a subordinate way relates to the accomplishment of the Aldene Plan, was not introduced in evidence in the trial court. In any event a copy of the contract to be dated July 1, 1965 was included in the Attorney General's appendix. It contains the railroad's agreement to continue on a year to year basis passenger service in many areas of the State and provides for purchase by the State and lease to the carrier of an escalating number of new passenger cars to be used in that service. Ownership of the cars remains in the State and each car is required to bear the legend "State of New Jersey, Owner and Lessor." That it is the intention of the State to retain ownership of capital improvements is further revealed by Governor Hughes' special message to the Legislature on May 16, 1966. See, *Special Message on Transportation, p. 4*, where the Governor speaking of his proposed future plan for financing railroad capital improvements, said: "These improvements would remain the property of the State—an arrangement already in use in the state-federal new car program for the Pennsylvania Railroad." The contract includes the same forbearance stipulation regarding cessation of all or part of the passenger service as appears in the Central contract.

It is obvious from these agreements furnished by the Attorney General that ownership of the capital improvements does not pass to the railroads as suggested by plaintiffs, and therefore the monetary payments or the sums representing the value of the new passenger cars cannot be deemed donations of public money to private corporations.