PEOPLE of the STATE OF ILLINOIS et al., Plaintiffs-Appellants,

v.

CONSOLIDATED RAIL CORPORATION, Defendant-Appellee.

No. 78–2292.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1978.

Decided Dec. 29, 1978.

Rehearing and Rehearing En Banc Denied Jan. 25, 1979.

Gordon P. MacDougall, Washington, D. C., for plaintiffs-appellants.

Laurence Z. Shiekman, Philadelphia, Pa., for defendant-appellee.

Before FAIRCHILD, Chief Judge, and PELL and BAUER, Circuit Judges.

PELL, Circuit Judge.

The question presented by this appeal is, in large part, procedural. The defendant, Consolidated Rail Corporation (ConRail) is attempting to discontinue its rail passenger service between Chicago, Illinois, and Valparaiso, Indiana. The plaintiffs are attempting to prevent its doing so. The specific issue involved is whether ConRail is entitled to discontinue this particular passenger service simply by posting notice of the discontinuance for 60 days, and by notifying certain parties of the discontinuance, under the provisions of 45 U.S.C. § 744(a)(1), or whether ConRail is required to apply to the Interstate Commerce Commission (ICC) under 49 U.S.C. § 13a(1) (or to the appropriate state regulatory agencies).

The facts involved in this lawsuit are not complex and, for the most part, undisputed. ConRail operates four daily passenger trains between Valparaiso and Chicago. Approximately 500 commuters use this service in each direction daily. "Analysis of ConRail's Commuter Service Between Valparaiso, Indiana and Chicago" (Rail Services Planning Office, Interstate Commerce

Commission, August 24, 1978). These trains were formerly operated by the Penn Central Railroad. ConRail has operated these trains in accordance with various subsidy agreements since September 27, 1976. The most recent subsidy agreement was made with the Northwestern Indiana Regional Transportation Authority (NIRTA). NIRTA's subsidy agreement expired on September 30, 1978, and since that time neither NIRTA nor any other body has offered subsidy assistance to ConRail.

On August 1, 1978, in anticipation of the lapsing of the subsidy arrangement, ConRail gave notice that it intended to discontinue the service effective October 1, 1978. This discontinuance notice was purportedly given pursuant to the requirements of 45 U.S.C. §§ 744(a)(1) and 744(e). This form of discontinuance notice will be referred to as "summary discontinuance." The plaintiffs do not dispute that the notice given was adequate under the provisions of these sections. Rather, their contention is that the *summary* discontinuance provisions have no application to the discontinuance of these particular trains. Their position is that ConRail was required to obtain approval to discontinue from the Interstate Commerce Commission, under the provisions of 49 U.S.C. § 13a(1), or from the appropriate state regulatory agencies.

The plaintiffs brought this suit in the district court pursuant to 28 U.S.C. §§ 1331 and 1337 for preliminary and permanent injunctive relief against the proposed summary discontinuance. The district court held a hearing on September 29, 1978, and entered a temporary restraining order prohibiting the discontinuance of the trains. A second hearing was held on October 6, 1978. At that time, the district court vacated the temporary restraining order and dismissed the plaintiffs' complaint. The order was stayed until 7:00 p. m., Tuesday, October 10, 1978, to give the plaintiffs a chance to seek a further stay from this court.

On October 10, 1978, the plaintiffs applied for, and received, a stay of the district court order pending further order of this court. The stay of the district court order

is still in effect, and ConRail is still operating the trains in question.

## I.

Prior to the enactment of the Regional Rail Reorganization Act of 1973, Pub.L.No. 93–236, 87 Stat. 986 (January 2, 1974) (the "3–R Act"), railroads seeking to discontinue service over an interstate line would have been required to seek the approval of one of the two regulatory agencies.

The 3–R Act was enacted in response to a major rail crisis which was precipitated when a number of railroads in the northeast and midwest entered reorganization proceedings. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 108, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Section 301 of the 3–R Act, 45 U.S.C. § 741, authorized the establishment of ConRail as a private for-profit corporation to which various railroad properties would be conveyed.

In addition, § 304(a) of the 3–R Act authorized a summary discontinuance procedure, to be available in limited cases, which would permit ConRail to discontinue service by posting a notice of discontinuance for 60 days, and by notifying certain designated parties. 45 U.S.C. § 744(a). Under this procedure, approval of the ICC or state agencies was not required. Section 304(a) of the 3–R Act, 45 U.S.C. § 744(a) provided:

### TERMINATION OF RAIL SERVICE

Sec. 304. (a) Discontinuance.—Except as provided in subsections (c) and (f) of this section, (1) rail service on rail properties of a railroad in reorganization in the region which transfers to the Corporation or to profitable railroads operating in the region all or substantially all of its rail properties designated for such conveyance in · · final system· plan, and (2) rail service c. rail properti.: of a profitable railroad operating in the region which transfers substantially all of its rail properties to the Corporation or to other railroads pursuant to the final system plan may be discontinued to the extent such discontinuance is not precluded by the

terms of the leases and agreements referred to in section 303(b)(2) of this title if—

(A) the final system plan does not designate rail service to be operated over such rail properties; and

(B) not sooner than 30 days following the effective date of the final system plan, the trustee or trustees of the applicable railroad in reorganization or a profitable railroad give notice in writing of intent to discontinue such rail service on a date certain which is not less than 60 days after the date of such notice; and

(C) the notice required by paragraph (B) of this subsection is sent by certified mail to the Governor and State transportation agencies of each State and to the government of each political subdivision of each State in which such rail properties are located and to each shipper who has used such rail service during the previous 12 months.

It is undisputed that § 304(a) is not directly applicable to the Valparaiso-Chicago line involved in this case. The reason is that § 304(a) expressly excludes from its scope rail properties which the final system plan designates to be operated. The Final System Plan (FSP) is a document which the United States Railway Association prepared, under the provisions of §§ 201 and 202 of the 3–R Act, 45 U.S.C. §§ 711 and 712. The Valparaiso-Chicago line is included in the FSP at 1 FSP 46. As a result, summary discontinuance under § 304(a) does not directly apply. Indeed, counsel for ConRail conceded at oral argument that prior to the later enactment of § 304(e) (discussed *infra*), ConRail would have had no alternative but to apply to the ICC for approval of the proposed discontinuance of passenger service over this FSP line.

## II.

The FSP was submitted to Congress on July 26, 1975. The FSP was specifically approved in § 601(e) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No. 94–210, 90 Stat. 31 (Febru-

ary 5, 1976) (the "4–R Act"). As codified, this approval appears at 45 U.S.C. § 718(d)(1). The 4–R Act also had the effect of revising parts of the 3–R Act, and the effect of some of these revisions is at issue in this appeal.

The critical change made by the 4–R Act, for the purpose of this case, is the addition to the 3–R Act of 45 U.S.C. § 744(e). That subsection, in relevant part, reads as follows:

(e) Rail passenger service.—(1) The Corporation (or a profitable railroad) shall provide rail passenger service for a period of 180 days immediately following the date of conveyance (pursuant to section 743(b)(1) of this title), with respect to any rail properties over which a railroad in reorganization in the region, or a person leased, operated, or controlled by such a railroad, was providing rail passenger service immediately prior to such date of conveyance. Such service shall be provided on such properties regardless of whether or not such properties are designated in the final system plan as rail properties over which rail service is required to be operated, except with respect to properties over which such service is provided by the National Railroad Passenger Corporation.

(2) If a State (or a local or regional transportation authority) was providing financial assistance to support the operation of rail passenger service, pursuant to a lease or agreement which was in effect immediately prior to the date of conveyance (pursuant to such section 743(b)(1) of this title, the Corporation (or a profitable railroad) shall be bound by the service provisions of such lease or agreement for the duration of the 180-day mandatory operation period specified in paragraph (1) of this subsection. If a State or such an authority was providing financial assistance for the continuation of rail passenger service on rail properties immediately prior to such date of conveyance, it shall provide the same level of financial assistance during such 180-day mandatory operation period. If no such financial assistance was being provided or if no

such lease or agreement was in effect immediately prior to such date of conveyance, with respect to any such rail properties, the Corporation (or a profitable railroad) shall provide the same level of rail passenger service, for the duration of such 180-day mandatory operation period, that was provided prior to such date by the applicable railroad. If—

(A) such financial assistance is not provided;

(B) a State (or a local or regional transportation authority) has not, by the end of such 180-day mandatory operation period, offered a rail service continuation payment pursuant to subsection (c)(2)(A) of this section;

(C) an applicable rail service continuation payment pursuant to such subsection (c)(2)(A) of this section is not paid when it is due; or

(D) a payment required under a lease or agreement, pursuant to section 743(b)(2) of this title or subsection (c)(2)(B) of this section, is not paid when it is due,

the Corporation (or, where applicable, the National Railroad Passenger Corporation, a profitable railroad, or the trustee or trustees of a railroad in reorganization in the region) may (i) discontinue such rail passenger service, and (ii) with respect to rail properties not designated for inclusion in the final system plan, abandon such properties pursuant to subsections (a) and (b) of this section. ·

. . . . .

(4) If a State (or a local or regional transportation authority)—

(A) offers a rail service continuation payment, pursuant to subsection (c)(2)(A) of the section and under regulations issued by the Office pursuant to section 715(d)(5) of this title, for the operation of rail passenger service after the 180-day mandatory operation period, and

(B) provides compensation, pursuant to paragraph (2) of this subsection, for

operations conducted during the 180-day mandatory operation period, the Corporation (or a profitable railroad) shall continue to provide such service after the end of such period, except as otherwise provided in this subsection.

. . . . .

(6) Notwithstanding any other provision of this subsection, the Corporation is not obligated to provide rail passenger service on rail properties if a State (or a local or regional transportation authority) contracts for such service to be provided on such properties by an operator other than the Corporation, except that the Corporation shall, where appropriate, provide such operator with access to such properties for such purpose.

The first important change under § 744(e) is the requirement that ConRail shall provide rail passenger service for 180 days following the date of conveyance (April 1, 1976), whether or not the lines are included in the FSP. Secondly, § 744(e)(2) provides that, on the happening of any of the events specified in (A) through (D), ConRail "may (i) discontinue such rail passenger service, and (ii) with respect to rail properties not designated for inclusion in the final system plan, abandon such properties pursuant to subsections (a) and (b) of this section." The reference to subsections (a) and (b) is to § 744(a) and (b), which deal with summary discontinuance and summary abandonment, respectively.[1] The parties read this language in divergent ways. ConRail's reading, supported by the district court's opinion in this case, is that the language means that FSP passenger service may be summarily discontinued, but may not be summarily abandoned. In other words, the FSP exclusion is read as applying only to abandonment, and the reference to § 744(a) and (b) is read as modifying *both* the language contained in subparagraph (i) and subparagraph (ii).

The plaintiffs, by contrast, take the position that the reference to § 744(a) and (b)

---

1. In this connection, it should be noted that summary discontinuance, under § 744(a) is al-*ways* a prerequisite to summary abandonment under § 744(b).

modifies only the last antecedent clause of the statute, and therefore applies only, under (ii), to abandonment, and not to discontinuance. Therefore, they argue, the language under (i) which permits discontinuance of the service is *not* made subject to the special summary procedures under § 744(a), so that ConRail must apply to a regulatory agency for discontinuance under the normal procedures.

There is a further complexity involved in reading this statute. The language discussed above applies, literally, only to discontinuance and abandonment at the end of the 180 day mandatory operation period. In this case, the service was not discontinued at the end of the 180 day period, because various subsidy offers were made resulting in the continuation of the service, the most recent of which was the NIRTA subsidy agreement which expired on September 30, 1978. In this case, then, ConRail must argue that the language which it reads as providing for summary discontinuance applies, although indirectly, by virtue of language in § 744(e)(4). That language provides that if a state or local authority offers a continuation payment for periods beyond the 180 day period, "the Corporation . . . shall continue to provide such service after the end of such period, except as otherwise provided in this subsection." ConRail reads the "except as otherwise provided" language as bringing into operation the discontinuance language under § 744(e)(2). The plaintiffs, by contrast, argue that the "except as otherwise provided" clause more likely refers to the provisions of § 744(e)(6), which otherwise has no bearing on this appeal.

As we noted earlier, § 304(a), as originally enacted in the 3–R Act specifically excluded FSP lines from the summary discontinuance procedures. Counsel for ConRail conceded at oral argument that, in light of this specific exclusion, ConRail must argue, in effect, that § 304(e), added in the 4–R Act, amends § 304(a) by eliminating the FSP exclusion. We note, however, that § 304(e) was added by § 804 of the 4–R Act, which begins: "Section 304 of the Re-

gional Rail Reorganization Act of 1973 (45 U.S.C. 744) is amended to read as follows: . . . ." All of § 304, as amended, is then set forth, *including* the original exclusion of FSP lines from the summary discontinuance procedures, in § 304(a). To say the least, this results in an ambiguity in the entire statute with respect to the question of whether summary discontinuance is appropriate under the circumstances of this case. ConRail, in effect, asks us to ignore the FSP exclusion in § 304(a), which was reenacted in the 4–R Act, and to hold that § 304(e) allows summary discontinuance of FSP passenger lines. This we refuse to do. It is a well-established principle of statutory construction that, whenever possible, statutes are to be construed so that no clause, sentence or word is rendered void or contradictory. *Rockbridge v. Lincoln*, 449 F.2d 567, 571 (9th Cir. 1971). Before holding that Congress has amended § 304(a) by implication, there should be shown the clear intent of Congress to do so. *Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527, 533 (7th Cir. 1974). We find no clear evidence of this intent in this case. Given the possibility of conflict between the provisions of § 304(a) and (e), it is our duty to attempt to reconcile the two provisions, absent clearly expressed Congressional intent to the contrary. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Before holding that part of § 304(a) has been modified by the addition of § 304(e), it is reasonable to insist on the use of language which would show that Congress has made a considered determination to that end. *Id.*, 419 U.S. at 134, 95 S.Ct. 335.

There is nothing in the legislative history of the 4–R Act to support ConRail's reading of the statute. Rather, the legislative history shows, in general terms, that the motivation for the 4–R Act was to provide for the continuation of certain rail passenger lines, as the district court noted. On this basis, the district court stated that the inconclusive legislative history could not overrule the clear language of the statute, citing *Ex Parte Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1948). There can

be no quarrel with this basic proposition, but we do not read the clear language of the statute as permitting summary discontinuance in this case. At best, the language of the statute is ambiguous.

The district court put considerable emphasis on the fact that, under its reading of the entire legislative scheme under the 3–R and 4–R Acts, local subsidization is the *sine qua non* of continued passenger service. This reading may well be correct, as a matter of substantive law.[2] In the context of the present appeal, however, two additional problems remain. First, whatever the substantive law may be, this appeal relates solely to the necessary *procedures* which must be followed in discontinuing FSP passenger service. In other words, even if ConRail is right in asserting that the absence of a subsidy makes it absolutely entitled to discontinue the service, this would leave unanswered the question as to which procedure must be used in achieving that goal.

Second, under the current posture of the case, there has been no determination as to the actual extent of the deficit which Con-Rail is incurring in continuing this service. The plaintiffs dispute the fact that the operation is running at a deficit. We join the district court in expressing doubt as to whether the plaintiffs can seriously dispute the existence of a deficit. Nevertheless, the determination of the appropriate allocation of costs in determining whether this service runs at a deficit is a complex operation, and a hearing before the regulatory agency in the context of the normal discontinuance procedures would serve to clarify the extent of the deficit.

It should be noted that ConRail's construction of the statute is contrary to normal rules for construction of statutes. What was said in *United States v. Pritch-*

*ett,* 152 U.S.App.D.C. 307, 311, 470 F.2d 455, 459 (1972) is equally applicable here:

Ordinarily, qualifying phrases are to be applied to the words or phrase immediately preceding and are not to be construed as extending to others more remote. This Rule of the Last Antecedent is not an inflexible rule, and is not applied where the context indicates otherwise. Since there is no such indication here, we conclude that the application of the rule would be in keeping with the intention expressed in this statute. (footnote omitted)

Therefore, we hold that the reference in § 744(e)(2) to summary procedures modifies only the immediately proceeding clause, which deals with abandonment, and does not reach the more remote clause, which deals with discontinuance. In the absence of any indication that summary procedures should apply to discontinuance, the normal regulatory procedures under 49 U.S.C. § 13a(1) apply.

As noted, nothing in the legislative history directly addresses the question involved in this appeal. However, one reference in the legislative history should be considered even though it appears to contradict the language of the part of the statute which it discusses. 45 U.S.C. § 744(g), after the amendments of the 4–R Act, reads as follows:

(g) Abandonment by Corporation.—After the rail system to be operated by the Corporation or a subsidiary thereof under the final system plan has been in operation for 2 years, the Commission may authorize the Corporation or a subsidiary thereof to abandon any rail properties as to which it determines that rail service over such properties is not required by the public convenience and necessity, if the Corporation or a subsidiary thereof

---

**2.** The parties are not in agreement as to this substantive question. It is apparent, from the plaintiffs' citation of *Southern Railway Co. v. North Carolina,* 376 U.S. 93, 84 S.Ct. 564, 11 L.Ed.2d 541 (1964) that it is their position that the 3–R and 4–R Acts do not change the substantive law to be applied by the ICC in determining whether to approve discontinuance.

ConRail, by contrast, apparently takes the position that, under the 3–R Act, the only question for the ICC to decide would be whether Con-Rail is operating the service at an unsubsidized deficit. We do not decide this substantive question since, in our view, it is appropriate for this question to be left, in the first instance, to the regulatory agency.

can demonstrate that no State (or local or regional transportation authority) is willing to offer a rail service continuation payment pursuant to subsection (c) of .this section. The Commission may, at any time after the effective date of the final system plan, authorize additional rail service in the region or authorize the abandonment of rail properties which are not being operated by the Corporation or any subsidiary or affiliate thereof or by any other person. Determinations by the Commission under this subsection shall be made pursuant to applicable provisions of the Interstate Commerce Act.

The language of this subsection prescribes normal ICC regulatory procedures with respect to the *abandonment* of rail service under the FSP. The subsection does not appear to discuss *discontinuance* of service on FSP lines. Nevertheless, the following statement, discussing this subsection, is found in S.Rep.No. 595 (Conference Report), 94th Cong. 222, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 14, 237:

"(8) ConRail was required to provide service on all final system plan lines for 2 years, after which ConRail was subject to normal ICC abandonment and discontinuance procedures; . . . ." [3]

Of course, we need not determine the meaning of § 744(g), since it is not involved in this appeal. The quoted language from the Senate Report does, however, at the least tend to support the plaintiffs' position that Congress did not intend, in the 4-R Act, to allow summary discontinuance of FSP passenger service.

ConRail places some reliance on *Coleman v. Consolidated Rail Corp.*, 449 F.Supp. 621 (N.D.Ohio 1977). That case approved the summary discontinuance of passenger service over an FSP Line, at the end of the 180 day mandatory service period under 45 U.S.C. § 744(e)(1). The very brief opinion in that case shows no evidence that the plaintiffs there argued that summary dis-

continuance of FSP lines was *not* permitted under § 744(e)(2). Indeed, the court seems to have simply assumed that summary discontinuance was allowed. Under the circumstances, we do not deem the *Coleman* case to be persuasive.

Finally, we reiterate the fact that the FSP was specifically approved by Congress as part of the 4-R Act. The approval appears, as codified, at 45 U.S.C. § 718(d)(1). The FSP, at 1 FSP 46, makes the following statement, which is applicable to the service here in question:

Services Never Covered by Leases or · Contracts and Operated Over Lines to be Acquired by ConRail, Chessie or Amtrak

The services will be continued on the day of conveyance. USRA recommends that ConRail seek a satisfactory subsidy arrangement for provisions of these services. If such agreements have not been executed by time of conveyance, USRA recommends that ConRail post these services for discontinuance. *Approval for such discontinuances must be obtained from the proper regulatory authorities.* (Emphasis added.)

Similarly, the "Evaluation of the U.S. Railway Association's Final System Plan" (Interstate Commerce Commission, August 25, 1975) states, at p. 20, "Any proposed discontinuance of such services would require approval by the proper regulatory agencies in the normal manner." Undoubtedly, counsel for ConRail was correct, in his contention made at oral argument, that the "approval" of the FSP by Congress does not amount to the enactment of the FSP into positive law. On the other hand, the reference in the FSP to the "proper regulatory authorities" can be taken as some indication of what Congress had in mind. We do not give undue weight to this factor, as we

---

**3.** A similar interpretation is found in Adams, *Railroad Revitalization and Regulatory Reform Act of 1976—An Interim Review*, 32 Business Lawyer 975, 998 (1977): "However, on all lines which it operates pursuant to the Final System Plan, ConRail is required to provide service for a minimum of two years. Thereafter it is subject to the normal discontinuance and abandonment procedures of the ICC."

realize that both the FSP, and the USRA "Evaluation" quoted above were prepared *prior* to the enactment of the 4–R Act, at a time when the reference to the "proper regulatory authorities" was, without dispute, correct. Nevertheless, the approval of the FSP by Congress, as written, in the 4–R Act, does tend to undercut ConRail's position in this case. This, taken along with the other factors which we have mentioned, persuades us that summary discontinuance of FSP passenger service is not allowed under the 3–R and 4–R Acts.

It should be emphasized that the choice in this case is not one between a simple, expedited discontinuance procedure on the one hand, and an endlessly cumbersome regulatory process on the other. The summary discontinuance procedure which ConRail attempted to use in this case involved the posting of notices 60 days prior to the anticipated discontinuance. The I.C.C. procedure under 49 U.S.C. § 13a(1) also presents a relatively speedy mode of discontinuance, since the Commission must act on the proposed discontinuance within a period of not more than four months after the date when the discontinuance would otherwise have become effective.

We conclude, therefore, that 45 U.S.C. § 744 does not authorize ConRail summarily to discontinue rail passenger service over an FSP line. Accordingly, the notices posted and served under that section are ineffective to discontinue the service. The judgment of the district court, which dismissed the complaint of the plaintiffs, is Reversed, and the cause is Remanded with instructions to enter a permanent injunction in favor of the plaintiffs, prohibiting ConRail from discontinuing rail passenger service over the Valparaiso, Indiana to Chicago route under the summary procedures of 45 U.S.C. § 744(a).

BAUER, Circuit Judge, dissenting.

I respectfully dissent. In dismissing the complaint herein, Judge Will entered a well-reasoned and, to me, persuasive opinion in which he discusses both § 744(e)(2) and § 744(a)(1). He then states:

> Given this unambiguous statutory language, it is clear that Congress, with respect to passenger rail service, altered the distinction made in § 304(a) of the 3–R Act between final system plan and non-final system plan lines. This specific statutory directive takes precedence over the inconsistent language in the *earlier* written Final System Plan notwithstanding the fact that Congress "approved" the Final System Plan in the 4–R Act. See 4–R Act § 601(e), 45 U.S.C. § 718(d)(1). Such general approval cannot be construed to override or condition the specific statutory framework of § 744(e). See, e. g., *Monte Vista Lodge v. Guardian Life Ins. Co. of America,* 384 F.2d 126, 129 (9th Cir. 1967).

Later, Judge Will concludes:

> In sum, we hold that ConRail was entitled to use the notice procedures of § 744(a)(1) by virtue of the direct statutory mandate in § 744(e)(2) and (4). No question has been raised with respect to ConRail's compliance with the § 744(a)(1) procedures. More importantly, since August 1, 1978, no transportation authority has offered to make the continued subsidy payments required under § 744(e). Accordingly, ConRail may discontinue the service.

In an argument over statutory construction of an enactment that I conceive to be poorly drawn, I believe that the opinion of the trial court is sounder than the majority opinion of this court. I would affirm.